**2026-1893**

# United States Court of Appeals for the Federal Circuit

COLLISION COMMUNICATIONS, INC.,

*Plaintiff-Appellant,*

– v. –

SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC.,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the Eastern District of Texas in No. 2:23-CV-00587-JRG, Honorable J. Rodney Gilstrap, Judge*

**CORRECTED BRIEF OF *AMICUS CURIAE* ALLIANCE OF U.S. STARTUPS AND INVENTORS FOR JOBS (USIJ) IN SUPPORT OF APPELLANTS AND IN SUPPORT OF REVERSAL**

ROBERT P. TAYLOR
RPT LEGAL STRATEGIES PC
2443 Fillmore Street, #332
San Francisco, CA 94115
(415) 447-3975
robert.taylor@rptstrategies.com

*Counsel for Amicus Curiae*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (715931)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1893

**Short Case Caption** Collision Communications, Inc. v. Samsung Electronics Co., Ltd.

**Filing Party/Entity** Alliance of U.S. Startups and Inventors for Jobs ("USIJ")

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/10/2026

Signature: /s/ Robert P. Taylor

Name: Robert P. Taylor

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Alliance of U.S. Startups and Inventors for Jobs | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICUS CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 6

I. The "Right to Exclude" Provides the Foundation for Patent Law in the United States ........ 6

II. Several of the World's Largest Digital Technology Companies Have Become Vicious Predators in the Aftermath of *eBay* ........ 10

III. The Inability of Startups and Small Companies to Enjoin Infringement Diminishes American Innovation ........ 13

IV. The Failure to Create a Meaningful "Right to Exclude" Has Driven Some of Our Most Creative Entrepreneurs and Inventors to Other Pursuits and Other Countries ........ 17

V. Individual Inventors and Small Companies Are Critical to American Innovation ........ 21

VI. The District Court Abused Its Discretion in Denying Relief to Collision Communications ........ 25

VII. Conclusion ........ 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*eBay v. MercExchange, LLC*,
547 U.S. 388 (2006) ....................................1, 2, 3-8, 10, 12, 14-17, 20, 25, 26, 28

*Gordon v. Washington*,
295 U. S. 30 (1935) ....................................................................................3

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ....................................................................................3

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) ........................................................ 5, 9, 27, 28

*Windsurfing Int'l, Inc. v. AMF, Inc.,*
782 F.2d 995 (Fed. Cir. 1986) ....................................................................27

**Statutes & Other Authorities:**

35 U.S.C. § 283 ..........................................................................................2

Chris Miller, "CHIP WARS," Simon & Schuster (2022)..........................................21

Clayton Christensen, "INNOVATORS DILEMMA," Harvard Business Review Press (1997)........................................................................................................21

Dr. Kristina M. L. Acri, née Lybecker, Professor of Economics, Department of Economics & Business, Colorado College, entitled "Injunctive Relief in Patent Cases: The Impact of eBay" (2024) ............................................................ 14-15

Fed. R. App. P. 29(b) ..................................................................................1

Michael Hiltzik, "DEALERS OF LIGHTNING," Harper Collins Publishing (1999)........................................................................................................22

"The Survival of U.S. Patent Damage on Appeal; An Empirical Study of Award Size and Rates of Affirmance," by Bowman Heiden at Haas School of Business..........................................................................................12

UC Berkeley Forum, "How US Patent Enforcement Decline Elevated the UPC as the Global Forum for Injunctive Relief, November 20, 2025..........19

USIJ Policy Report entitled "The Importance of an Effective and Reliable Patent System to Investment in Critical Technologies" (2020) ....................18

USPTO, "Intellectual Property and the U.S. Economy 2024" ................................18

The Alliance of U.S. Startups and Inventors for Jobs ("USIJ") submits this brief as *amicus curiae* pursuant to Fed. R. App. P. 29(b) in support of Appellant's request for permanent injunction following its success on all relevant issues submitted to the jury, including a finding that the infringement was willful. The district judge abused his discretion in ruling that the patent owner failed to satisfy the Supreme Court's requirements set forth in *eBay v. MercExchange, LLC*, 547 U.S. 388 (2006). To the contrary, traditional rules of equity jurisprudence, applied to the facts in this case, provide ample support for – indeed, compel – injunctive relief.

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* USIJ is a coalition of 23 startup companies and their affiliated executives, inventors and investors ("USIJ Cohort"). Our members and supporters depend on stable and reliable patent protection as an essential foundation for making long term and continuing investments of capital and time commitments to high risk businesses developing new technologies.[1] USIJ was formed in 2012 to address concerns that legislation, policies and practices

[1] A list of USIJ members is attached as Appendix A.

No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than this *amicus curiae* made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

adopted by the U.S. Congress, the Federal Judiciary and certain Federal agencies were and are placing individual inventors, entrepreneurs and research-intensive startups ("the USIJ Cohort") at an unsustainable disadvantage relative to their larger incumbent rivals, both domestic and foreign, and others that would misappropriate their inventions. A disproportionately large number of strategically critical breakthrough inventions are attributable to individual inventors and the small companies that implement them.

## SUMMARY OF ARGUMENT

Section 154 of the Patent Act defines the rights of a patent owner as "the **right to exclude others** from making, using, offering for sale, or selling the invention throughout the United States …." (emphasis supplied). To implement that provision, the Patent Act also provides that courts "may grant injunctions in accordance with the principles of equity." (35 U.S.C. §283). Any reasonable application of those two provisions should have led the district judge to grant a permanent injunction against the continued use of intellectual property owned by Collision Communications and literally stolen by Samsung through its pretense of negotiating a license. Contrary to the conclusion of the court below, an injunction was not precluded by the Supreme Court's unanimous opinion in *eBay v. MercExchange, LLC* (547 U.S. 388 (2006)).

The fundamental problem with the ruling below is that the overall outcome is grossly unfair to the patent owner, which is precisely what "principles of equity" were created to ameliorate. A framework of equitable principles evolved in England for three or four centuries before our nation was founded, and these were incorporated into our own judicial system as they existed at the time of the founding of the U.S.[2] The touchstone of equity has always been the use of judicial discretion within that framework of principles to achieve fairness in situations where an overly rigid interpretation of rules might otherwise lead to plainly unjust or unconscionable outcomes.

The *eBay* ruling should have been interpreted and applied in the light of that history. Instead, the trial judge gave short shrift to the patent owner's statutory "right to exclude" and appears to have ignored entirely the staggering unfairness of allowing a foreign company with annual revenues of more than $200 billion and a market capitalization of more than a trillion dollars to steal

---

[2] *E.g., Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (opinion by Scalia, J.). ("We have long held that [U.S. courts are authorized] to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries,") citing, *inter alia*, *Gordon v. Washington*, 295 U. S. 30, 36 (1935) ("Substantially, then, the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)."

the technology developed by a creative American startup through artifice and deception – and then continue using the technology as its own. Such an outcome defies common sense and certainly cannot be called "equitable."

If the stolen property were anything but intellectual property, there would be arrest warrants out for the Korean executives who made the conscious decision to steal someone else's property for their own use. Such behavior is a poster child for the blatant disrespect for the U.S. patent system exhibited by many of the largest corporations in the digital technology space, Samsung among them. In part II, *infra*, we discuss the highly unethical business strategy that Big Tech giants like to call "efficient infringement," which more accurately should be called "predatory infringement." For the world's largest technology companies, this has become the preferred method of dealing with small companies seeking compensation for the use of their technologies.

We urge this Court to reverse the decision of the trial court and to order the immediate entry of an injunction. The district judge treated each of the four factors it was required to consider as a standalone problem, unrelated to one another, other aspects of the case, or the outcome. This rigid checklist approach was not required by the *eBay* decision or any of this Court's implementing jurisprudence. It is inconceivable that balancing hardships (often also called

"balancing equities") could weigh in favor of Samsung on the facts of this case, nor is there any evidence of an adverse impact on the public interest.

In *Robert Bosch, LLC v. Pylon Mfg. Corp*. (659 F.3d 1142 (Fed. Cir. 2011), this Court overruled a trial court's denial of injunctive relief because the lower court had erroneously based its decision on an overly rigid analysis of irreparable harm. The opinion stated:

> "Although *eBay* abolishes our general rule that an injunction normally will issue when a patent is found to have been valid and infringed, it does not swing the pendulum in the opposite direction. In other words, even though a successful patent infringement plaintiff can no longer rely on presumptions or other short-cuts to support a request for permanent injunction, it does not follow that courts should entirely ignore the fundamental nature of patents as property rights granting the owner the right to exclude." (*Id*. at 1149).

After reversing the lower court on irreparable harm, the *Bosch* panel then addressed *sua sponte* the other three factors set out in *eBay*, finding each factor satisfied by the record and ordering entry of an injunction. (*Id*. at 1155, *et seq*.). Although the panel concluded that neither party had made a showing as to whether the public would be served or disserved by entry of an injunction, the panel relied on other aspects of the analysis to order entry of an injunction – in

particular the right to exclude. Put differently, even though this Court ruled that a rebuttable presumption of irreparable harm was abolished in *eBay*, the Court recognized that the factual foundation for creating the presumption in the first place was that continued infringement necessarily runs counter to the fundamental nature of patent property and a patent owner's right to exclude, thereby justifying a permanent injunction.[3]

## ARGUMENT

### I. The "Right to Exclude" Provides the Foundation for Patent Law in the United States.

Section 154 of the Patent Act defines the rights of a patent owner as "the **right to exclude others** from making, using, offering for sale, or selling the invention throughout the United States …." (emphasis supplied). This language is derived from Article I, Section 8 of the U.S. Constitution setting forth the enumerated powers of Congress. Clause 8 of that Section states:

> "To promote the progress of science and useful arts, by securing for limited times to authors and inventors **the exclusive right** to their respective writings and discoveries." (emphasis supplied).

[3] *Accord*, Justice Robert's concurring opinion in *eBay,* which noted that infringement of a valid patent gave rise to injunctive relief in the vast majority of cases that predated this Court's use of a presumption. (547 U.S. at 395.)

That the foregoing clause is the only place in the original Constitution using the word "right" manifests the singular importance that the Framers placed on inventors and innovators, which in turn, imparts both meaning and context to the term "right to exclude others." Justice Roberts, in his concurring opinion in *eBay*, made reference to the same exclusionary right, observing that:

> "From at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases. This 'long tradition of equity practice' is not surprising, given the difficulty of protecting a right to exclude through monetary remedies that allow an infringer to use an invention against the patentee's wishes …." (547 U.S. at 395).

Nor does the Supreme Court's unanimous *eBay* opinion gainsay or diminish the significance of the right to exclude. The opinion simply instructs this Court and the district courts to apply "traditional principles of equity" instead of automatic or broad general rules in examining the four relevant factors that are employed almost universally in Anglo-American law when deciding to issue an injunction. (*Id*. at 391.) Under the *eBay* ruling, trial courts are given broad discretion to assess these traditional factors, but nothing in the opinion dictates how a trial judge should make that assessment or whether each of the factors must be considered independently from the others. Indeed, the

unanimous Court was careful to point out that it was not prescribing particular thresholds or procedures for determining the presence or absence of any of the four steps:

> "[W]e take no position on whether permanent injunctive relief should or should not issue in this particular case, or indeed in any number of other disputes arising under the Patent Act. **We hold only that** the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that **such discretion must be exercised consistent with traditional principles of equity,** in patent disputes no less than in other cases governed by such standards." (emphasis supplied).

The foregoing language does not impose any requirements as to how the four factors are to be analyzed or weighted vis-à-vis one another by the district judge, leaving those considerations to his or her discretion. The opinion does not mention the phrase "burden of proof," but rather requires that the patent owner "demonstrate" that the record allows the district judge to consider each of the four factors referred to in the *eBay* opinion in the exercise of discretion. And *eBay* surely does not require the isolation of the factors from one another as the court below chose to do. To illustrate, the Memorandum and Order of May 17, 2026, states on page 15: "Collision has not met its burden of

establishing that the balance of the hardships favors injunctive relief, in light of its failure to identify any particular hardship it would face if the injunction were to be denied.”). This statement cannot be reconciled with the judge’s earlier finding that denial of an injunction would result in irreparable harm to the patent owner. (See, Order, p.10).

This Court has recognized the absence of any intent on the part of the Supreme Court to dictate the methodology for issuance of an injunction, as long as the trial court avoids the use of sweeping or automatic rules in the exercise of its discretion. Thus, in *Robert Bosch, LLC v. Pylon Mfg. Corp.* (659 F.3d 1142 (Fed. Cir. 2011), a panel opinion by Judge O’Malley reversed a trial court and ordered issuance of an injunction, because the trial court predicated a lack of irreparable injury on the fact that the accused products (windshield wiper blades) were not the core business of Bosch, discounting the direct competition and loss of market share that Bosch had experienced. The opinion noted, particularly, the “difficulty faced by courts ‘struggling to balance the absence of a presumption of irreparable harm with a patentee's right to exclude.’" (*Id*. at 1145-46).

We call attention to the foregoing as a reminder that the “right to exclude” lies at the very core of the U.S. patent system, and that thousands of inventors

and entrepreneurs, over more than two centuries, have proven the remarkable genius of this legal regime that has differentiated our nation from anything that had ever gone before. Injunctive relief "in the vast majority of patent cases" is an essential feature of a viable patent system.

## II. Several of the World's Largest Digital Technology Companies Have Become Vicious Predators in the Aftermath of *eBay*.

Misrepresentations of the *eBay* decision by this Court and the district courts have played a major role in undermining the importance of patents as perceived by the USIJ Cohort and other inventors and investors. This is particularly a problem in the digital technology industries, where the contemptuous lack of respect for the patents of individual inventors and small companies has become palpable. A number of the corporate giants that purvey digital communications and computing products and services, believing that the likelihood of facing an injunction is low to nonexistent, have pursued a strategic approach to the patents of small companies that they like to call "efficient infringement." Translated into simple English, efficient infringement means it is more efficient to steal technology than it is to compensate those who create it.[4] That ilk of lawless behavior is glaringly apparent in the instant case.

---

[4] The practice was described candidly in an article on patent enforcement in the United States published December 14, 2019 in The Economist, which reported:

The efficient infringement strategy was designed intentionally to nullify the intellectual property rights reflecting the innovative contributions of brilliant inventors and smaller companies. Infringers that are several orders of magnitude larger than a patent owner often will devote nearly unlimited financial resources to defending a patent infringement suit rather than negotiating a license. They do so by creating unnecessary discovery disputes, filing motions to postpone events on the pretrial calendar, endless appeals, and challenging the validity of the patents they are infringing (and sometimes additional patents as well, simply to increase the cash outlays by the patent owner), etc.[5] These companies know that they can usually outlast a much

---

> "Boris Teksler, Apple's former patent chief, observes that 'efficient infringement', where the benefits outweigh the legal costs of defending against a suit, could almost be viewed as a 'fiduciary responsibility,' **at least for cash-rich firms that can afford to litigate without end.**" (emphasis supplied).

[5] A real-world example of how this strategy actually works to entangle a patent owner with endless litigation is described in the record of *Samsung Electronics Ltd. v. Netlist, Inc*, CAFC Dkt. 23-2304, soon to be argued in this Court. This is an appeal from a ruling of the PTAB that one of Netlist's patent claims was held invalid after the same claim had been upheld by the PTO on multiple prior occasions, one of which was affirmed by this Court.

USIJ filed a brief in Dkt. 24-2304, calling attention to the fact that Samsung filed 1130 Inter Partes Review petitions through 2024 – one IPR every 4.2 days for 13 years – attacking the patents of U.S. companies. We also called attention to a chart in Netlist's opening brief showing that its '912 patent has been tied up in reexamination requests and IPRs initiated by Google and Samsung for the entire life of that soon to expire patent. https://usij.org/wp-content/uploads/2025/11/24-2304-Amicus-Brief-USIJ-2.pdf.

smaller company, and even if not, they face little or no risk of ever being enjoined from selling infringing products or penalized for driving a small company out of business (as happened in the instant case). They also know that establishing a reputation for scorched earth litigation tactics and other forms of aggressive behavior will deter other small companies from even attempting to enforce their patents or obtain license royalties for their technology.

Damages are rarely a satisfactory substitute for injunctive relief where the patent owner is attempting to build a business around patents covering a new technology. A damage award that will not be paid for years down the road will almost always be a fraction of the profitability gained from infringing during the pendency of the litigation and beyond. Moreover, the readily apparent reluctance of courts to enforce large jury awards, even when fully justified based on the infringer's levels of sales and profits, adds yet another layer of difficulty for small companies.[6]

Before *eBay* and its progeny came to dominate patent remedies, even large companies would at least try to negotiate a proper license that compensated the inventor for his or her creative work. Today, actual good-faith

---

[6] *See, e.g.,* "The Survival of U.S. Patent Damage on Appeal; An Empirical Study of Award Size and Rates of Affirmance," by Bowman Heiden at Haas School of Business, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5513538. The paper shows that large damage awards are rarely enforced, either because this Court finds flaws in the damage analysis or reverses the finding of liability.

negotiations with small companies in the digital technology industries are a rarity, and small patent owners are simply left in the lurch with no likelihood of any avenue for redress.

Especially infuriating are situations where – as was established in this case – the infringer engages with the patent owner under the guise of negotiating a license, while in fact the infringer is using the negotiations only to gain sufficient access to the new technology so its engineers can copy it. The trial record shows that Samsung executives made a conscious decision to steal the technology that Collision's engineers had revealed to them over a period of two years, because it would cost less than a license would have cost, this even after being told by its own engineers that such conduct was improper.[7] The plaintiff's experience here was devasting, but it is not an isolated example. Numerous innovative and entrepreneurial companies have had their technology stolen in similar scenarios from the same Big Tech Playbook.

## III. The Inability of Startups and Small Companies to Enjoin Infringement Diminishes American Innovation.

This appeal has important implications, not only for the parties here, but for this nation's continued leadership in science and technology exploration, our competitiveness on a global scale, and ultimately the national security and

---

7 Appellant's Opening Brief, pp. 7 -8.

welfare of all Americans. Technology leadership has been the decisive factor in this nation's economic and military prowess for more than a hundred years. Moreover, technology leadership depends in significant part on a viable and robust system for enforcing property rights, which some policy makers seem increasingly to have forgotten.

Despite the Supreme Court's statement in *eBay*, noted *supra,* that the Court was not attempting to prejudge the outcome in that case or any other, the decision has been construed and applied sufficiently often by district judges to discourage many aggrieved patent owners from trying to enforce their patents. A recent study covering 23 years of requests for injunctions in patent cases, both before and after *eBay*, determined that:

> "… the *eBay* ruling significantly reduced both the request for and grant of injunctions, relative to the pre-eBay baseline, and that the decision differentially impacted different categories of plaintiffs. Specifically, the relative decrease in requests for permanent injunctions was 87.4% for non-practicing entities and 65.0% for operating companies. … [T]he relative decreases in grants of permanent injunctions were 91.2% for NPEs and 66.7% for operating companies."[8]

---

[8] *See, e.g.*, study of district court decisions from 2000 to 2023 by Dr. Kristina M. L. Acri, née Lybecker, Professor of Economics, Department of Economics & Business, Colorado College, entitled "Injunctive Relief in Patent Cases: The

These outcomes cast an almost inescapable pall over any company seeking to enforce its patents, but particularly so for startups and small companies that can commercialize their inventions **only** through licensing. One of the most important benefits of the U.S. patent system has been its encouragement of individual inventors and scientists to develop new technologies and pair up with other companies that have sufficient capital and essential infrastructure to commercialize them. In those situations, however, it is only by owning reliable and fully enforceable patents that these inventors can realize value for their efforts. As clearly illustrated by the case at bar, talking with larger companies may be perilous without such patents.

Particularly troublesome in the foregoing statistics is that nonpracticing entities – the so-called NPEs – are less likely than operating companies to qualify for injunctive relief. The Supreme Court held, in the *eBay* opinion, that companies should not be categorically denied injunctions because they do not make products, listing a number of situations in which an inventor might choose to license rather than make products.[9] Collision did not intend to make

Impact of eBay," https://www.researchgate.net/publication/384108178_Injunctive_Relief_in_Patent_Cases_the_Impact_of_eBay (2024).

[9] The unanimous *eBay* opinion states:

"For example, some patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than

smartphones, but still developed very valuable technology implementing its patents and should be permitted to protect it. In reality, however, companies not selling a product that competes with the infringer are highly unlikely to obtain injunctions. This is unfortunate, because many startups develop technologies that they can only license; this is particularly the case in the digital communications arena, because few if any startups plan to sell smartphones or computers.

Notably, Samsung tried to argue that Collision had never sold anything covered by its patents and was therefore an NPE; the judge did not accept that argument as a basis for denial of an injunction, but many other judges would. (See, Judge Gilstrap Order, p.7) ("this argument verges on an assertion that a non-practicing entity cannot establish irreparable harm").

The fact that patents in the digital technology industries are not likely to be enforceable has rendered U.S. patents essentially useless for a large portion of the USIJ Cohort and other communities of inventors. Patents incentivize investment of capital and human resources to develop new technologies **only** where investors and entrepreneurs believe them to be reliable property rights

---

undertake efforts to secure the financing necessary to bring their works to market themselves. Such patent holders may be able to satisfy the traditional four-factor test, and we see no basis for categorically denying them the opportunity to do so." (*eBay*, 547 U.S. at 393)

that carry the "right to exclude" incumbent and other companies from copying or stealing the new technologies. For a growing number of inventors and investors, such beliefs have become a relic of a former time.

## IV. The Failure to Create a Meaningful "Right to Exclude" Has Driven Some of Our Most Creative Entrepreneurs and Inventors to Other Pursuits and Other Countries.

The longer-term economic impact of the current state of patent jurisprudence is ominous although predictable. Faced with the likelihood that some larger company will try to implement the "efficient infringement" playbook, fewer and fewer entrepreneurs and their investors can justify the commitments needed to develop new technologies that compete with the digital technology giants or that will have value only if the new technology can be licensed to such companies. By walking rampant over the technologies of small companies, the corporate giants have established themselves as either monopolies or duopolies and have no room for upstarts that would challenge their dominance, which in turn has led to a decline in the formation of startups willing to do so.[10] It should therefore come as no surprise to U.S. policy makers that over the 20 year period since *eBay,* an increasing number of entrepreneurs,

---

[10] *See, e.g.*, the report of the House Judiciary Subcommittee on Antitrust, Commercial and Administrative Law entitled "Investigation of competition in digital markets," described *infra*, in Part V.

inventors and their investors have simply abandoned the U.S. patent system as a foundation for developing new technologies that are easily copied. Some have stopped investing time and resources in enterprises whose value depends on patents, choosing instead to invest in consumer products and services that do not require patents, such as restaurants, hotels, fashion design and the like.[11] This is a tragedy in and of itself, because it is the IP intensive industries that create the best jobs and largest amount of GPD growth, a fact that has been true for several decades.[12]

In addition, a growing number of small companies that innovate in areas dominated by tech giants no longer look to the U.S. to enforce their patent rights,

---

[11] In 2020, USIJ published a Policy Report entitled "The Importance of an Effective and Reliable Patent System to Investment in Critical Technologies," confirming the serious adverse economic effect of a weakened U.S. patent system. https://usij.org/wp-content/uploads/2024/07/USIJFullReport_Final_2020.pdf. The study found that as U.S. patents became less reliable, the share of venture capital funding going to firms in patent-intensive industries fell from over 50% in 2004 to about 28% in 2017. Funding for semiconductors, medical devices, and pharmaceuticals declined sharply in relative terms, while capital flowed toward less patent-dependent sectors such as social networking and consumer finance. Interviews with leading investors and inventors traced this shift to the growing unpredictability of the U.S. patent system and the perceived inability to obtain injunctions.

[12] *See, e.g.*, USPTO, "Intellectual Property and the U.S. Economy 2024" concluding that IP intensive companies account for 44% of both GDP and private sector employment, 53% higher wages and 82% of exports. https://www.uspto.gov/sites/default/files/documents/uspto-aug2026-report-ip-intensive-industries.pdf (2026).

but instead are bringing their patent infringement cases in other countries – most notably the Unified Patent Court ("UPC") in Europe. The UPC was established in June 2023 and almost overnight became the jurisdiction of choice for many American companies suing one of America's large digital technology companies. The reasons are readily apparent; the UPC grants permanent injunctions in 60% of the cases it decides on the merits and preliminary injunctions in more than half of them.[13] Injunctions are the default remedy for patent infringement and are almost always granted, barring some extenuating circumstance.[14]

---

[13] Exemplary is R2 Technologies Corporation which invented technology that minimizes the likelihood that a voltage spike will damage an expensive semiconductor chip. Intel began infringing the R2 patents and was successful in persuading the PTAB to invalidate some of them. After Intel informed R2 that the company never took patent licenses from small companies, R2 sued in Europe and was successful in obtaining injunctions as to several of its patents, which in turn led Intel to take a license. *Compare*, Business Wire, 3/18/24 https://www.businesswire.com/news/home/20240317595568/en/R2-Semiconductor-Announces-Two-Important-Updates-in-Intel-Patent-Infringement-Case; *with* https://newsroom.intel.com/corporate/update-litigation-2024 dated 8/30/24 showing that Intel ultimately did agree to a license. The case is powerful evidence that injunctions are essential to prevent the blatant theft of IP covering valuable technology developed in America.

[14] *See, e.g.*, UC Berkeley Forum, "How US Patent Enforcement Decline Elevated the UPC as the Global Forum for Injunctive Relief, November 20,2025. https://www.law.berkeley.edu/research/bclt/bclt-legal-analysis/upc-p1

Still other inventors have simply given up inventing, which is a significant loss of talent and creativity that our country can ill afford to lose.[15] It is difficult to measure the size of this group, but the realization that any talented scientists and engineers are giving up their primary pursuits over the inability to protect their work should be troubling indeed.

We strongly urge the Court, in deciding this case, to take a serious and realistic look at the overall importance of injunctive relief to the actual objectives of the U.S. patent system. This Court can do much to clarify that only the unanimous opinion of the Supreme Court in *eBay* should be treated as legal precedent, and not the vague speculation engaged in by Justice Kennedy in his concurring opinion. It is exteremely important for this Court to make clear that the Supreme Court did not intend to abolish injunctive relief for small companies, particularly permanent injunctions following a hard-fought victory on both validity and infringement.

---

[15] Exemplary is Gregory G. Raleigh, one of the founders of USIJ, who is listed as an inventor on more than 340 U.S. patents. Based on some of his patents, at a time when patents could be enforced against large companies, Mr. Raleigh was able to start two companies based on his inventions and ultimately sell them to larger companies. Given the changes in the patent system since *eBay*, however, he has abandoned that pursuit for an entirely different business.

## V. Individual Inventors and Small Companies Are Critical to American Innovation.

It is also important for this Court and other policy makers to recognize that startups and small companies are extremely important to the long term future of our country, and that these companies need reliable patent protection for their high-risk business endeavors to a far greater extent than established companies. The latter group enjoys the benefits of a brand and customer base, market share, essential infrastructure for engineering and manufacturing, an existing sales and marketing team which in many cases obviate the need for patents altogether, and other benefits of size. A substantial body of literature points out, however, that many large companies with established markets, despite the pronouncements of their public relations departments, are largely incapable of genuine breakthrough innovation, because it risks disrupting existing revenue streams and bonus structures.[16] Many large companies can do

---

[16] Numerous studies have shown that the internal profit and bonus dynamics of large companies rarely tolerate disruptive innovation, so that what they call "innovation" is really just marginal improvements on existing technologies. *See, e.g.,* Clayton Christensen, "INNOVATORS DILEMMA," Harvard Business Review Press (1997), whose studies describe a number of industries where disruptive innovation caused the company's failure.

*Accord*: Chris Miller, "CHIP WARS," Simon & Schuster (2022), pp. 191-97, describing Intel's inability to innovate and enter the market for mobile processing until after smaller companies were able successfully to develop low power microprocessors necessary for smartphones.

some things very well – refine the engineering and exterior design of products, create and expand infrastructure needed for scaling, distribute products through worldwide networks, etc., all of which are important. What this group does not do well is genuine breakthrough innovation. It is smaller, more nimble companies that want to challenge the large entrenched incumbents who are the real drivers of breakthrough innovation. This is a cohort that is critical to the future of this nation.

A 2023 report of the National Economic Council entitled, "The Economics of Investing in America," notes that startups and small to medium sized companies are a significant driver of innovation in this nation – not the entrenched corporate giants that falsely claim that role. The NEC report states:

> "The evidence is clear that new small and medium-sized businesses are drivers of innovation. Yet when a few firms (or one single firm) dominate

---

*Accord*: Michael Hiltzik, "DEALERS OF LIGHTNING," Harper Collins Publishing (1999), describing how the senior management at Xerox recognized in 1970 that the dawn of digital imaging ultimately would destroy its analog copier business, and so created Xerox Parc, staffed with some of the most brilliant young inventors and scientists in the world, only to discover that the institutional forces within the company still would not allow most of the resulting innovation to come to market.

a market, they can stifle and stymie disruptive startups and other new businesses."[17]

Stifling competition is both the objective and the effect of the efficient infringement strategies developed by the tech giants, most of which are either monopolies or duopolies in their respective commercial silos.

A similar observation was made by the House Judiciary Subcommittee on Antitrust, Commercial and Administrative Law entitled "Investigation of competition in digital markets," which in 2022 released a 451-page assessment of the state of competition in the digital technologies ("House Report"). An important finding of the Subcommittee confirms the substantial decline in the number of startups and entrepreneurs willing to start companies to compete with large incumbents:

"In recent decades, however, there has been a sharp decline in new business formation as well as early-stage startup funding. The number of new technology firms in the digital economy has declined, while the entrepreneurship rate—the share of startups and young firms in the industry as a whole—has also fallen significantly in this market.

[17] https://bidenwhitehouse.archives.gov/wp-content/uploads/2023/07/Economics-of-Investing-in-Am erica.pdf (p.12).

Unsurprisingly, there has also been a sharp reduction in early-stage funding for technology startups." House Report at p.46.

Additionally, a 2022 report of the National Bureau of Economic Research entitled, "Of Academics and Creative Destruction: Startup Advantage in the Process of Innovation," finds:

> "First, startup innovation will be more valuable and ultimately more impactful than that of either universities or large firms, and second, startups will generate innovations that are more radical and disruptive than those of incumbent firms." … Overall, our findings suggest that startup innovation is qualitatively different from the innovation in other organizational settings: there is a clear 'startup advantage' in the quality and impact of startup patents relative to established firms."[18]

An essay by Professor Jonathan Barnett at USC,[19] entitled "Why Big Tech Favors Weak IP," explains how strong enforcement of IP allows entrepreneurs and investors to develop disruptive new innovation that

---

18 https://www.nber.org/system/files/working_papers/w30362/w30362.pdf (pp. 4-5).

19 Barnett is the Torrey H. Webb Professor of Law at the Gould School of Law at the University of Southern California. He has written extensively about the importance of intellectual property to innovation and the creation of disruptive new technologies.

challenges the entrenched incumbents and why weak IP rights diminish such innovation. Spring 2021 Issue of REGULATION, pp. 16 -18.

## VI. The District Court Abused Its Discretion in Denying Relief to Collision Communications.

In Order and Memorandum dated May 17, 2026 ("Order"), the district judge rejected Collision's argument that it would suffer irreparable harm as a matter of law, saying that such a ruling would be inconsistent with *eBay*. (Order, pp. 5, 8 - 10). The judge nevertheless held that continued use of the patented technology against the wishes of the patent owner, when combined with the loss of opportunities for design-wins,[20] and the difficulty of establishing monetary damages satisfied the need for irreparable harm. (*Id.*) That finding was entirely consistent with both the statutory right to exclude and traditional principles of equity under which injunctions almost always have been granted to stop infringement after a trial confirms infringement.

As to the adequacy of monetary damages, the judge, after an extensive discussion of the arguments offered by the parties and the U.S. Department of Justice, found that monetary damages for continued infringement would be

[20] The term "design win" is commonly used in the electronics industry to refer to success by a component supplier to have its component (such as a processor) selected for inclusion in a larger product, such as a computer.

inadequate, mainly because of the difficulty of valuing patents in the context of litigation. (Order, p.12).

The judge then addressed the balancing of hardships as between the parties, taking a rigid and formalistic approach that does not comport with traditional rules of equity. More specifically, the judge treated "balancing" as a discrete requirement, separate and apart from the rest of the evidence and apparently unrelated to his earlier finding that Collision would suffer irreparable harm if infringement were allowed to continue. That was error. Traditional principles of equity required the court to conduct a balancing of harms presented by the totality of evidence, which weighs strongly in favor of Collision. Contrasting with its own irreparable harm, Collision demonstrated that its proposed injunction would require only that Samsung stop using the software and algorithms that infringed and that cessation could be accomplished easily through the signal's connection of Samsung smartphones to a network. Samsung presented no real evidence that could overcome the finding of irreparable harm. Nevertheless, the judge ruled that Collision had not met its "burden on proof" on the issue of hardships.

As noted in the Summary, *supra*, the *eBay* opinion does not use the word "burden" and certainly does not require the trial court to compartmentalize each of four factors for a separate procedural examination as if they were elements

of a cause of action. Beyond showing that its proposed injunction would do nothing except stop the infringement, Collision cannot be expected to show what is **not harmful** to Samsung; that is up to Samsung and it failed to demonstrate any harm other than loss of the opportunity to go on using the stolen property.

In footnote 2 of the opinion, the judge appears to be saying that being ordered to stop infringing is a relevant form of harm to be balanced against harm to the patent owner. That is inconsistent with this Court's ruling in *Bosch* that courts should not ignore the fundamental nature of patents as property rights granting the owner the right to exclude. The *Bosch* Court also cited its earlier decision in *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) to point out that "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.").

The reality is that any rational balancing of the equities in this case weighs so heavily in favor of Collision that there really should be no question about it. This is a case where the newly developed and innovative technology of an American startup was literally stolen by a foreign conglomerate several hundred thousand times larger, forcing the small company to lay off most of its employees. If the district judge had looked at the forest instead of a few

individual trees, he would have reached a different conclusion. To be fair, equity must look at overall outcomes, not evidentiary minutia.

As to the public interest issue, the trial court found that neither party made a satisfactory showing on how the public interest would be affected. (Order, p.17). But that was also true in the *Bosch* case, where this Court nevertheless held that the district judge had abused her discretion in not granting an injunction. When there is no discernible adverse impact on the public, the public interest has long been recognized to reside in the statutory right to exclude, and nothing in *eBay* holds to the contrary.

## VII. Conclusion.

The interpretation given to the *eBay* decision by this Court and many district courts has spawned a level of disrespect for the property rights of small companies that can be corrected, if at all, only through injunctive relief. The signal importance of startups and small companies to disruptive innovation is undeniable, as is the growing refusal of entrepreneurs to rely on U.S. patents to protect the investment of capital and human resources. The case at bar provides a perfect opportunity for this Court to acknowledge the lawless behavior by Samsung's management and to restore a more "equitable" balance to the judicial process, as we believe was intended by the unanimous decision in *eBay*.

Date: August 10, 2026

*<u>/s/ Robert P. Taylor</u>*

Robert P. Taylor
RPT LEGAL STRATEGIES PC
2443 Fillmore Street, Suite 332
San Francisco, California 94115
Tel: (650) 400-6995
robert.taylor@rptstrategies.com

Counsel for *Amici Curiae* USIJ

# APPENDIX A

## USIJ Member Companies

*Alliance of U.S. Startups and Inventors for Jobs*

July 2026

USIJ is a coalition of inventors, startup companies, venture capitalists, incubators, and research institutions united in support of a strong U.S. patent system. Member companies span medical devices, semiconductors, biotechnology, wireless technology, cybersecurity, and venture capital — sectors where patent protection is critical to sustaining innovation investment and American global competitiveness.

### 23 Member Companies

1. **Altos Labs** | Biotechnology / Longevity Research *altoslabs.com*
2. **BioCardia** | Medical Devices / Cardiovascular *biocardia.com*
3. **Calyxo** | Medical Devices / Urology *calyxoinc.com*
4. **Centripetal** | Cybersecurity / AI *centripetal.ai*
5. **Direct Flow Medical** | Medical Devices / Cardiovascular *directflowmedical.com*
6. **DivX** | Digital Media / Video Technology *divx.com*
7. **ExploraMed** | Medical Device Incubator *exploramed.com*
8. **Fogarty Institute** | Medical Device Incubator / R&D *fogartyinstitute.org*
9. **Fortem IP** | IP Management / Licensing *fortemip.com*
10. **Lauder Partners** | Venture Capital *lauderpartners.com*
11. **Liquidax Capital** | IP Asset Management / Investment Advisory *liquidaxcapital.com*
12. **Materna Medical** | Medical Devices / Women's Health *maternamedical.com*
13. **Netlist** | Semiconductors / Memory Technology *netlist.com*
14. **NuCurrent** | Wireless Power / IP Licensing *nucurrent.com*
15. **PuraCath Medical** | Medical Devices / Infection Prevention *puracath.com*
16. **Rearden** | Technology / AI / Holographics *rearden.com*
17. **Revelle Aesthetics** | Medical Devices / Aesthetics *revelleaesthetics.com*
18. **ShapeTx** | Biotechnology / Gene Therapy *shapetx.com*
19. **SORAA** | Semiconductors / LED Lighting *soraa.com*
20. **Techquity Capital** | IP Strategy / Venture Capital *techquitycap.com*
21. **TuneTx** | Biotechnology / Gene Therapy *tunetx.com*
22. **Willow** | Consumer Health / Medical Devices *onewillow.com*
23. **Pavey Investments** | Venture Capital *paveyinvestments.com*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2026-1893

**Short Case Caption:** Collision Communications, Inc. v. Samsung Electronics Co., Ltd.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 6,534 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 08/12/2026

Signature: /s/ Robert P. Taylor

Name: Robert P. Taylor