No. 2026-1893

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

COLLISION COMMUNICATIONS, INC.,

*Plaintiff–Appellant*

v.

SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC.,

*Defendants–Appellees*

---

Appeal from the United States District Court for the Eastern District of Texas, Case No. 2:23-cv-00587-JRG, Judge J. Rodney Gilstrap

---

# BRIEF OF AMICI CURIAE HIGH TECH INVENTORS ALLIANCE (HTIA), SOFTWARE & INFORMATION INDUSTRY ASSOCIATION (SIIA), ALLIANCE FOR AUTOMOTIVE INNOVATION (AAI), AND TECHNET IN SUPPORT OF DEFENDANTS–APPELLEES

---

Nathan K. Kelley
Jonathan I. Tietz
ASHURST PERKINS COIE US LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Phone: 202.654.6200
nathan.kelley@ashurstperkins.com
jonathan.tietz@ashurstperkins.com

Andrew T. Dufresne
ASHURST PERKINS COIE US LLP
33 E Main St, Ste 201
Madison, Wisconsin 53703-3095
Phone: 608.663.7460
andrew.dufresne@ashurstperkins.com

*Counsel for Amici Curiae HTIA, SIIA, AAI, and TechNet*

September 21, 2026

## Certificate of Interest

I certify that the information below is complete to the best of my knowledge.

Date: September 21, 2026

Signature: /s/Andrew T. Dufresne
Name: Andrew T. Dufresne

| 1. Represented Entity | 2. Real Party in Interest | 3. Parent Corporations and 10% Stockholders |
|---|---|---|
| High Tech Inventors Alliance | n/a | n/a |
| Software & Information Industry Association | n/a | n/a |
| Alliance for Automotive Innovation | n/a | n/a |
| TechNet | n/a | n/a |

| 4. Other Legal Representatives |
|---|
| n/a |

| 5. Related Cases |
|---|
| n/a |

| 6. Organizational Victims and Bankruptcy Cases |
|---|
| n/a |

## Table of Contents

Certificate of Interest ........ ii

Table of Authorities ........ iv

Table of Abbreviations & Conventions ........ viii

Interest of Amici Curiae ........ ix

Introduction ........ 1

Argument ........ 2

I. The changed landscape for obtaining injunctive relief after *eBay* has fostered innovation and economic development, not hindered it ........ 2

A. Real-world data show *eBay* had a beneficial effect on innovation and the economy for companies of all sizes ........ 2

B. Accepting Collision's premise that "continued infringement will itself typically qualify as irreparable harm" would harm innovation and distort economic outcomes ........ 9

II. The Court should affirm the denial of an injunction but correct the district court's erroneous evaluation of irreparable harm and inadequate remedies at law ........ 12

A. The irreparable-harm and adequate-remedy factors require forward-looking harm that an injunction would remedy ........ 14

B. Courts should not apply implicit or de facto presumptions in favor of irreparable harm or inadequate remedies at law ........ 17

C. Uncertainty in damages calculations does not change the character of a harm that is intrinsically monetary ........ 20

Conclusion ........ 22

Certificate of Compliance

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .......... 21

*Apple Inc. v. Samsung Elecs. Co.*,
809 F.3d 633 (Fed. Cir. 2015) .......... 16

*Aransas Project v. Shaw*,
775 F.3d 641 (5th Cir. 2014) .......... 16

*Crescent Servs., Inc. v. Mich. Vacuum Trucks, Inc.*,
714 F.Supp.2d 425 (W.D.N.Y. 2010) .......... 17

*CSIRO v. Buffalo Tech., Inc.*,
492 F.Supp.2d 600 (E.D. Tex. 2007) .......... 14

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .......... 1, 7, 8

*ePlus, Inc. v. Lawson Software, Inc.*,
No. 9-cv-620, 2011 WL 2119410 (E.D. Va. May 23, 2011) .......... 14, 15

*ePlus, Inc. v. Lawson Software, Inc.*,
789 F.3d 1349 (Fed. Cir. 2015) .......... 16

*Fleet Eng'rs, Inc. v. Mudguard Techs., LLC*,
No. 2022-2001, 2023 WL 5219773 (Fed. Cir. Aug. 15, 2023) .......... 16

*Future Motion, Inc. v. Lai*,
No. 23-cv-1742, slip op. (D. Or. June 24, 2025) .......... 18

*Hynix Semiconductor Inc. v. Rambus Inc.*,
609 F.Supp.2d 951 (N.D. Cal. 2009) .......... 14

*Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*,
No. 04-cv-5172, 2009 WL 512156 (D.N.J. Feb. 27, 2009) .......... 20

*Kiss Nail Prods., Inc. v. Shenzhen Jinri Elec. Appliance Co.*,
No. 18-cv-5625, slip op. (E.D.N.Y. July 23, 2020) .......... 17, 18

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......... 19, 20

*Rasmussen Instruments, LLC v. DePuy Synthes Prods., Inc.*,
No. 20-cv-11807, slip op. (D. Mass. Mar. 30, 2023) .... 18

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) .... 17

*Smart Billiard Lighting, LLC v. Lucid Ball Sports, Inc.*,
No. 23-cv-2457, slip op. (E.D.N.Y. July 10, 2023) .... 17, 18

*Socket Sols., LLC v. Import Glob., LLC*,
185 F.4th 1150 (Fed. Cir. 2026) .... 17

*Spanakos v. Aronson*,
No. 17-cv-80965, slip op. (S.D. Fla. Jan. 3, 2019) .... 18

*Stringer v. Whitley*,
942 F.3d 715 (5th Cir. 2019) .... 14

*Trump v. California*,
609 U.S. ___, No. 26A124, 2026 WL 2473573 (Aug. 24, 2026) .... 16, 17

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .... 13, 19

*United States v. Oregon State Medical Society*,
343 U.S. 326 (1952) .... 16

*US Inventor, Inc. v. Squires*, ___ F.4th ___,
No. 24-2378, 2026 WL 2450313 (Fed. Cir. Aug. 21, 2026) .... 14, 16

*Waterton Polymer Prods. USA, LLC v. Edizone, LLC*,
No. 12-cv-17, 2015 WL 1186258 (D. Utah Mar. 16, 2015) .... 20

*Wonderland Switzerland AG v. Evenflo Co.*,
162 F.4th 1346 (Fed. Cir. 2025) .... 16

**Constitution** **Page(s)**

U.S. CONST. art. I, § 8, cl. 8 .... 2

**Other Authorities** **Page(s)**

Kristina M.L. Acri née Lybecker, *Injunctive Relief in Patent Cases: The Impact of* eBay, 38 HARV. J.L. & TECH. 735 (2024) .... 4, 5

Ian Appel, Joan Farre-Mensa & Elena Simintzi, *Patent Trolls and Startup Employment*, SSRN (July 22, 2018), https://ssrn.com/abstract=2887104 .......... 12

Fred Bereskin, Po-Hsuan Hsu & Huijun Wang, *Growth of Firms Under Injunction Risk*, 69 J.L. & ECON. 175 (2026) .......... 2, 3, 6

James Bessen & Michael J. Meurer, *The Direct Costs from NPE Disputes*, 99 CORNELL L. REV. 387 (2014) .......... 12

Colleen Chien, *Startups and Patent Trolls*, 17 STAN. TECH. L. REV. 461 (2014) .......... 12

Lauren Cohen, Umit Gurun & Scott Duke Kominers, *The Growing Problem of Patent Trolling*, 352 SCIENCE 521 (2016) .......... 11

Thomas F. Cotter, Erik Hovenkamp & Norman Siebrasse, *Demystifying Patent Holdup*, 76 WASH. & LEE L. REV. 1501 (2019). 7, 10

Fed. Trade Comm'n, *Patent Assertion Entity Activity* (Oct. 2016) .......... 11, 12

Christian Helmers & Brian J. Love, *Injunctions and Venture Capital: An Empirical Look at* eBay's *Effect on Startups*, 16 N.Y.U. J. INTELL. PROP. & ENT. L. (forthcoming 2027), manuscript at https://ssrn.com/abstract=7329598 .......... 2, 5, 6, 7, 8

Christian Helmers & Brian J. Love, *Patent Law Reform and Innovation: An Empirical Assessment of the Last 20 Years*, 79 INT'L REV. L. & ECON. 106210 (2024) .......... 3, 6

Josh Landau, *Much Ado About Injunctions*, PATENT PROGRESS (Aug. 1, 2019), https://patentprogress.org/2019/08/much-ado-about-injunctions/ .......... 4

Mark A. Lemley & Carl Shapiro, *Patent Hold-Up and Royalty Stacking*, 85 TEX. L. REV. 1991 (2007) .......... 5, 7, 10

Brian J. Love, *An Empirical Study of Patent Litigation Timing*, 161 U. PA. L. REV. 1309 (2013) .......... 5

Filippo Mezzanotti, *Roadblock to Innovation: The Role of Patent Litigation in Corporate R&D*, 67 MGMT. SCI. 7362 (2021) .......... 3, 4, 6

Filippo Mezzanotti & Timothy Simcoe, *Patent Policy and American Innovation After* eBay*: An Empirical Examination*, 48 RSCH. POL'Y 1271 (2019) ........................ 3, 4, 5, 6, 7, 8, 9

*Much Ado About Injunctions: Redux*, PATENT PROGRESS (Sept. 12, 2026), https://patentprogress.org/2026/09/much-ado-about-injunctions-redux/ ........................................................................ 4, 7, 11, 13

Christopher B. Seaman, *Permanent Injunctions in Patent Litigation After* eBay*: An Empirical Study*, 101 IOWA L. REV. 1949 (2016) .............. 4

Carl Shapiro, *Injunctions, Hold-Up, and Patent Royalties*, 12 AM. L. & ECON. REV. 280 (2010)........................................................7

## TABLE OF ABBREVIATIONS & CONVENTIONS

| | |
|---|---|
| AAI | amicus curiae Alliance for Automotive Innovation |
| Appx__ | joint appendix at page __ |
| BlueBr__ | corrected opening brief of plaintiff-appellant Collision Communications Inc. (Dkt. 20) at page __ |
| Collision | plaintiff–appellant Collision Communications, Inc. |
| HTIA | amicus curiae High Tech Inventors Alliance |
| NPE | non-practicing entity |
| PAE | patent assertion entity |
| R&D | research and development |
| RedBr__ | response brief of defendant-appellee Samsung at page __ |
| Samsung | collectively, defendants-appellees Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. |
| SIIA | amicus curiae Software & Information Industry Association |
| TechNet | amicus curiae TechNet |
| VC | venture capital |
| (*xx*:*yy*–*zz*) | transcript page *xx* at lines *yy* to *zz* |

## Interest of Amici Curiae

The High Tech Inventors Alliance (HTIA) represents leading technology providers and includes some of the most innovative companies in the world. HTIA's member companies are some of the world's largest funders of research and development, investing more than $165 billion in these activities annually. They are also some of the world's largest patent owners and have collectively been granted nearly 350,000 patents.

The Software & Information Industry Association (SIIA) is the principal trade association for the software and digital information industries. SIIA represents nearly 400 firms involved in the business of information. Through its divisions, events, and advocacy, SIIA engages industry leaders and policymakers to ensure a vibrant information ecosystem that fosters creation, dissemination, and productive use. SIIA and its members work to proactively address issues and challenges that impact their industry segments with the goal of driving innovation and growth of the information economy.

The Alliance for Automotive Innovation (AAI) represents the full automotive industry, including the manufacturers producing most vehicles sold in the U.S. and equipment suppliers. Its members include auto manufacturers who together produce nearly 95 percent of the cars and light trucks

sold in the United States. Other members include original equipment suppliers, technology and other automotive-related companies, and other trade associations. Automakers invest billions of dollars each year in new technologies, including fuel-saving technologies such as electrification to transition to a low-carbon transportation future.

TechNet is the national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes dynamic American businesses ranging from startups to the most iconic companies on the planet and represents over 4.4 million employees and countless customers in the fields of information technology, artificial intelligence, e-commerce, the sharing and gig economies, advanced energy, transportation, cybersecurity, venture capital, and finance. TechNet advocates for a healthy patent system that yields high-quality patents, promotes all forms of innovation, deters frivolous patent litigation, and compensates patent owners based on the value of their contributions. TechNet's members include both startups who invest in and develop new technology, and larger companies and firms that invest in their work. TechNet supports reforms that deter litigation abuse in the courts,

including policies that discourage presumptions of irreparable harm where no such harm exists.

Amici's members are frequent targets of patent assertions by parties that do not make or sell any products, but who nevertheless seek injunctive relief. Amici's members invest significantly in research and development and innovation themselves, and they also invest in innovative startups that develop technology. Amici's members also frequently produce complex products made up of many components, many of which are alleged to be covered by numerous patents. Amici have an interest in ensuring that remedies for patent infringement are based on sound economic and legal principles.[1]

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), HTIA, SIIA, AAI, and TechNet state that no counsel for any party wrote any part of this brief. No party or person other than amici's respective members contributed money that was intended to fund the preparation or submission of this brief. Appellee Samsung, although a member of HTIA and TechNet, did not participate in the preparation of or decision to file this brief and did not provide funding intended for it. Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and Federal Circuit Rule 29 and its accompanying practice note, amici state that all parties have consented to the filing of this brief.

## Introduction

The district court denied an injunction, and that result should be affirmed. This brief addresses two important points relevant to the economic background and potential ramifications of the issues raised in this appeal.

*First*, Collision asks the Court to sideline, if not unseat, *eBay* and make injunctions available as an ordinary matter of course. The practical consequences of that would be significant. The empirical evidence after *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), shows that the departure from presumptive injunction standards and return to case-by-case equitable determinations has promoted innovation and economic development, including for startups. Part of that effect flows from reducing the outsized leverage of presumptive injunctive relief, which enabled plaintiffs to command settlements disproportionate to the otherwise incremental value of an asserted invention. Making injunctions once again presumptively available would threaten that progress in fostering innovation and economic activity.

*Second*, guidance is warranted to correct the district court's irreparable-harm and inadequate-remedy analyses, which might mislead other courts and encourage forum-shopping if left uncorrected. A prospective remedy is appropriate only when it addresses a prospective harm. The district court

strayed from that principle and from *eBay* when it rested its decision exclusively on prior harm, implicitly presumed irreparable harm and inadequate remedies from the mere fact of ongoing infringement, and allowed speculation about difficulties in quantifying damages to equate with inadequacy of monetary remedies.

The Court should affirm the denial of injunctive relief. But in so doing, it should clarify that the district court erred in assessing irreparable harm and inadequate remedies at law.

## Argument

### I. The changed landscape for obtaining injunctive relief after *eBay* has fostered innovation and economic development, not hindered it

#### A. Real-world data show *eBay* had a beneficial effect on innovation and the economy for companies of all sizes

The goal of the patent system is to encourage innovation and growth.[2] The empirical evidence since *eBay*,[3] and the experience of amici's members,

---

[2] *See* U.S. Const. art. I, § 8, cl. 8 (indicating purpose of patents "to promote the Progress of Science and useful Arts").

[3] *See generally* Christian Helmers & Brian J. Love, *Injunctions and Venture Capital: An Empirical Look at* eBay*'s Effect on Startups*, 16 N.Y.U. J. Intell. Prop. & Ent. L. (forthcoming 2027) (manuscript dated Aug. 21, 2026), https://ssrn.com/abstract=7329598 [hereinafter Helmers & Love, *Injunctions and Venture Capital*] (analyzing effect of *eBay* on venture-backed startups); Fred Bereskin, Po-Hsuan Hsu & Huijun Wang, *Growth of Firms*

shows an increase in American innovation, not a decrease, whether measured by patenting, R&D spending, capital investment, or productivity.[4]

*eBay* did not change the fact that permanent injunctions remain broadly available for market participants in the innovation ecosystem who face non-monetary harm from infringement—notably those who compete with infringers.[5] Empirical studies show that injunction grant rates remain

---

*Under Injunction Risk*, 69 J.L. & ECON. 175 (2026) (studying effect of *eBay* on development of new products); Christian Helmers & Brian J. Love, *Patent Law Reform and Innovation: An Empirical Assessment of the Last 20 Years*, 79 INT'L REV. L. & ECON. 106210 (2024) [hereinafter Helmers & Love, *Reform and Innovation*] (studying publicly traded firms to determine how innovation-related activities changed post-*eBay* for firms that were relatively exposed or unexposed to the effects of that decision); Filippo Mezzanotti, *Roadblock to Innovation: The Role of Patent Litigation in Corporate R&D*, 67 MGMT. SCI. 7362 (2021) [hereinafter Mezzanotti, *Roadblock*] (comparing companies that were relatively more versus relatively less exposed to patent litigation before and after *eBay*); Filippo Mezzanotti & Timothy Simcoe, *Patent Policy and American Innovation After* eBay*: An Empirical Examination*, 48 RSCH. POL'Y 1271 (2019) [hereinafter Mezzanotti & Simcoe, *Patent Policy*] (conducting aggregate and industry-level analyses of trends in U.S. patent filings, R&D expenditures by U.S. companies, venture capital funding, and total factor productivity before and after *eBay*).

[4] Mezzanotti, *Roadblock*, *supra* note 3, at 7383 (empirically concluding *eBay* "had a positive effect on innovation"); Bereskin et al., *supra* note 3, at 204 (concluding firms "pursue more new product lines" and fare better after *eBay*); Helmers & Love, *Reform and Innovation*, *supra* note 3, at 7 (observing "a significant post-*eBay* increase in R&D spending by firms with patent portfolios … similar to the set of patents litigated before *eBay* was decided").

[5] *See, e.g.*, Mezzanotti & Simcoe, *Patent Policy*, *supra* note 3, at 1274

high for practicing entities.[6] Although injunction *requests* initially fell after *eBay*, injunction requests were already on the decline by that time.[7] That makes sense. Patent litigation was increasingly becoming a business model unto itself—aimed at generating licensing revenue, not protecting an innovation space from competitors. Many patentees rationally prefer a running royalty over an injunction for business reasons, especially if the parties do

---

(summarizing statistics).

[6] *See, e.g.*, Christopher B. Seaman, *Permanent Injunctions in Patent Litigation After* eBay*: An Empirical Study*, 101 IOWA L. REV. 1949, 1986 tbl.2, 2002 (2016) (finding 72.5% grant rate post-*eBay*); Mezzanotti, *Roadblock*, *supra* note 3, at 7363 ("injunctions are still granted in the majority of cases" and "the decline … was larger for cases where the firms involved were not competitors"); Josh Landau, *Much Ado About Injunctions*, PATENT PROGRESS (Aug. 1, 2019), https://patentprogress.org/2019/08/much-ado-about-injunctions/ (finding that "plaintiffs who win their case post-*eBay* are almost as likely to receive a permanent injunction as they would have been pre-*eBay*") [hereinafter PATENT PROGRESS, *Injunctions*]; *Much Ado About Injunctions: Redux*, PATENT PROGRESS (Sept. 12, 2026), https://patentprogress.org/2026/09/much-ado-about-injunctions-redux/ (noting that "*eBay*, in fact, had little impact on the ability of operating companies to obtain an injunction" and presenting empirical results; further, "[f]or practicing entities, which made up the vast majority of injunction requests, courts granted injunctions 94% of the time … [which] is very consistent with pre-*eBay* rates") [hereinafter PATENT PROGRESS, *Injunctions Redux*]. Even the data from critics of *eBay* show a high injunction grant rate. *See, e.g.*, Kristina M.L. Acri née Lybecker, *Injunctive Relief in Patent Cases: The Impact of* eBay, 38 HARV. J.L. & TECH. 735, 749, 754 (2024) (noting 74–100% grant rate post-*eBay*, depending on the year, averaging around 85%).

[7] Acri, *supra* note 6, at 752, 754.

not compete or an injunction would not provide settlement leverage in a particular case (for instance, if a readily implemented non-infringing alternative exists and the court stays the injunction to allow it to be implemented).[8] The overwhelming majority of cases settle before trial. And NPEs increasingly wait until near the end of a patent's term to assert it in order to maximize damages.[9]

For non-practicing plaintiffs, *eBay* did decrease the number of granted injunctions.[10] But this has not harmed innovation.[11] To the contrary, it has had beneficial effects. Companies exposed more often to patent litigation—such as amici's members—increased their own research and patenting activity after *eBay* and became more likely to develop breakthrough innovations

---

[8] *See* Mark A. Lemley & Carl Shapiro, *Patent Hold-Up and Royalty Stacking*, 85 TEX. L. REV. 1991, 2038 (2007).

[9] *See* Brian J. Love, *An Empirical Study of Patent Litigation Timing*, 161 U. PA. L. REV. 1309, 1331, 1336–40 (2013).

[10] Helmers & Love, *Injunctions and Venture Capital*, *supra* note 3, at 19. That said, NPEs did not always obtain injunctions even before *eBay*. Acri, *supra* note 6, at 750 (noting 4 denials and 23 grants).

[11] Mezzanotti & Simcoe, *Patent Policy*, *supra* note 3, at 1271–72 (citing "no evidence of a decline in American innovation—whether measured as patents, R&D, venture capital or productivity growth"); *id.* at 1274 (observing "continued growth in patenting, R&D and productivity—particularly in those sectors most likely to be influenced by the eBay decision").

and highly cited patents.[12] R&D investment has not fallen; it has largely risen in affected industries, and productivity has increased too.[13] In fact, the data show that practicing companies vulnerable to injunctions have invested more in R&D, pursued more new product lines, seen greater profits, and fared better on the stock market after *eBay*—especially those with limited financing and intense competition.[14]

Those benefits reflect the fact that *eBay* helped temper the problem of disproportionate leverage.[15] Upfront determination of patent coverage and validity is difficult, licensing negotiations usually take place after a product's development, and switching costs for patented components are often cost-prohibitive.[16] The prospect of a near-certain, after-the-fact injunction

---

[12] Mezzanotti, *Roadblock*, *supra* note 3, at 7362–64, 7372–77; *see also* Mezzanotti & Simcoe, *Patent Policy*, *supra* note 3, at 1276, 1280–81 (seeing "no apparent decline in U.S. utility applications following [*eBay*]").

[13] Mezzanotti & Simcoe, *Patent Policy*, *supra* note 3, at 1281; *see also* Mezzanotti, *Roadblock*, *supra* note 3, at 7364 (demonstrating that "the ruling had a positive effect on R&D for public innovative firms"); Helmers & Love, *Reform and Innovation*, *supra* note 3, at 7 (noting statistically significant "increase in annual R&D investment" after *eBay* for affected firms).

[14] Bereskin et al., *supra* note 3, at 175, 204–05; Helmers & Love, *Reform and Innovation*, *supra* note 3, at 8.

[15] Mezzanotti, *Roadblock*, *supra* note 3, at 7363.

[16] Helmers & Love, *Injunctions and Venture Capital*, *supra* note 3, at 9–

thus often creates massive settlement leverage disproportionate to the incremental value of the invention.[17] This is especially true where a minor feature of a complex product is accused, yet because of product design or supply constraints, the feature cannot be readily disabled or removed. The problem is even worse where multiple patents cover the same product or even the same product feature because those distorted settlements stack with each other.[18] When injunctions were presumptively granted, this dynamic often disadvantaged investment in R&D in patent-crowded fields.[19]

---

10; Thomas F. Cotter, Erik Hovenkamp & Norman Siebrasse, *Demystifying Patent Holdup*, 76 WASH. & LEE L. REV. 1501, 1507 (2019); Mezzanotti & Simcoe, *Patent Policy*, *supra* note 3, at 1272; *see also* PATENT PROGRESS, *Injunctions Redux*, *supra* note 6 ("calibrating injunctions carefully is critical, especially in industries where products and services incorporate hundreds or even thousands of individual technologies, because injunctions are typically all-or-nothing").

[17] Helmers & Love, *Injunctions and Venture Capital*, *supra* note 3, at 9; Carl Shapiro, *Injunctions, Hold-Up, and Patent Royalties*, 12 AM. L. & ECON. REV. 280, 284 (2010); Lemley & Shapiro, *supra* note 8, at 1993; *eBay*, 547 U.S. at 396 (Kennedy, J., concurring) (noting injunctions as "bargaining tool[s] to charge exorbitant fees" based on "undue leverage" where "the patented invention is but a small component of the product").

[18] Lemley & Shapiro, *supra* note 8, at 1993.

[19] Helmers & Love, *Injunctions and Venture Capital*, *supra* note 3, at 10–11 & n.37; *eBay*, 547 U.S. at 397 (Kennedy, J., concurring) (noting a "burgeoning number of patents" of "potential vagueness and suspect validity").

Although proponents of unfettered injunctive relief often insist that injunctions are mission-critical for startups to secure funding, the data do not reflect that at all. Instead, *eBay* "had little effect on startup performance," and some patenting startups are *more* likely to receive VC funding after *eBay*.[20] The evidence shows no "increase[s] in shutdowns or down rounds, … reduction in … likelihood of raising an additional round of VC funding, or changes in the quarterly frequency of VC investments."[21] Even for startups that were securing patents when *eBay* issued—i.e., those who might have been expecting a presumption in favor of injunctive relief—there is no evidence that they "were relatively less likely to progress to late-stage VC funding, more likely to resort to unpriced fundraising deals, or slower to close funding rounds; nor [grow] at relatively slower rates as measured by headcount or the size of the VC deals they completed."[22]

[20] Helmers & Love, *Injunctions and Venture Capital*, *supra* note 3, at 33, 35, 41–42.

[21] *Id.* at 39.

[22] *Id.*; *see also* Mezzanotti & Simcoe, *Patent Policy*, *supra* note 3, at 1281 (noting "no evidence that the eBay decision influenced VC investment").

### B. Accepting Collision's premise that "continued infringement will itself typically qualify as irreparable harm" would harm innovation and distort economic outcomes

Doing away with the pre-*eBay* presumption and making clear that equitable relief is case-specific "gave U.S. courts more flexibility to try and choose the most appropriate remedy in a given case."[23] Displacing that flexibility for a return to sweeping directives about what will "ordinarily be appropriate" when it comes to an injunction request would have negative economic impacts.[24]

The path Collision proposes would not make injunctions meaningfully more available for companies that contribute to the American economy by making and selling products. These businesses can obtain injunctions against competitors when they prove irreparable harm and inadequacy of damages through factors like lost market share, price erosion, goodwill

[23] Mezzanotti & Simcoe, *Patent Policy*, *supra* note 3, at 1274; *id.* at 1281.

[24] BlueBr46; *see also id.* at 47 (arguing the district court "should have also recognized that continued infringement will *itself* typically qualify as irreparable harm under traditional principles"), *id.* at 51 (purporting to cite a "traditional equitable principle that continuing infringement is a form of irreparable injury"), *id.* at 51–52 (arguing that courts should "recognize ongoing violations as inflicting irreparable harm and rendering remedies at law inadequate").

damage, and the like. The position Collision and its amici advocate would benefit only NPEs, and PAEs most of all, who often lack even a connection to any practicing entity.

Injunctions enable patentees to extract royalties that far exceed the patented technology's true contribution to an accused product.[25] Patents are often narrow and incremental, and many complex products are covered by a panoply of them.[26] The cost of a design-around is often not related to the incremental value of the patented technology itself but other factors.[27] The situation is even worse where standard-essential patents are at issue, as an accused infringer cannot design around even the narrowest such patent without forfeiting the ability to support the relevant standard. Injunctions thus often lead to windfall settlements.[28] Even if such windfalls could be justified in the face of true irreparable harm, they represent nothing more than

[25] *See generally* Lemley & Shapiro, *supra* note 8; *see also* Cotter et al., *supra* note 16, at 1538 (injunctions are "not an incremental remedy").

[26] Lemley & Shapiro, *supra* note 8, at 1992, 2009, 2028 (noting, for example, "thousands" of patents covering individual 3G-enabled systems, microprocessors, media players, and the like).

[27] Lemley & Shapiro, *supra* note 8, at 2008–09; Cotter et al., *supra* note 16, at 1539.

[28] Lemley & Shapiro, *supra* note 8, at 1993, 2009–10.

outsized leverage in the absence of such harm.[29] *eBay* has tempered that effect to some degree, but making injunctions easier to obtain would reanimate it. It would also undo the positive economic returns that have arisen since *eBay* for innovators. And it would threaten the public interest in access to a variety of affordable, quality technologies, as well as the free flow of goods and services.

Economic harms from diluting *eBay*'s requirements would be pronounced for NPE suits—and PAE suits especially. NPE and PAE litigation diverts resources from productive innovation. Firms reduce their R&D investment significantly after settling with NPEs, and patent litigation reduces R&D intensity at small firms for years after a lawsuit.[30] NPE and PAE

---

[29] *See, e.g.*, PATENT PROGRESS, *Injunctions Redux*, *supra* note 6 (explaining that "calibrating injunctions carefully is critical," and that "if a tablet manufacturer offers an innovative patented feature that grants its tablets a competitive advantage and forms a major part of the tablet's market demand, an injunction may be appropriate to prevent a competitor from stealing that advantage via the sale of infringing competitor tablets" but if a PAE "seeking a royalty payout on a patent that contributes $0.10 of value in a minor component of a $1000 tablet is able to block the entire product from the market with an injunction, they have been gifted far more leverage than their technology warrants").

[30] Lauren Cohen, Umit Gurun & Scott Duke Kominers, *The Growing Problem of Patent Trolling*, 352 SCIENCE 521, 521–22 (2016); Fed. Trade Comm'n, *Patent Assertion Entity Activity* 25 n.94 (Oct. 2016).

litigation also impedes venture capital investment.[31] And startups are uniquely vulnerable to NPE and PAE demands.[32] They on average face litigation expenses amounting to more than a fifth of their annual revenue, significant diversion of founder time, and substantial operational impacts or losses of business lines.[33]

## II. The Court should affirm the denial of an injunction but correct the district court's erroneous evaluation of irreparable harm and inadequate remedies at law

Collision failed to carry its burden on all *eBay* factors. As Samsung points out, the district court did not abuse its discretion in denying an injunction based on Collision's failure to carry its burden on the balance-of-hardships and public-interest factors, and the Court should affirm. RedBr16–18. But regardless of Collision's deficient showings on the other *eBay* factors, a correct analysis of irreparable harm and the adequacy of monetary relief compels affirming the denial of injunctive relief on the independent ground

---

[31] *See* Fed. Trade Comm'n, *supra* note 30, at 25 n.93.

[32] *See* James Bessen & Michael J. Meurer, *The Direct Costs from NPE Disputes*, 99 CORNELL L. REV. 387, 422 (2014); Colleen Chien, *Startups and Patent Trolls*, 17 STAN. TECH. L. REV. 461, 472 (2014).

[33] Chien, *supra* note 32, at 472; Ian Appel, Joan Farre-Mensa & Elena Simintzi, *Patent Trolls and Startup Employment*, SSRN (July 22, 2018) (manuscript at 9), https://ssrn.com/abstract=2887104.

that, contrary to the district court's reasoning, Collision has failed to show irreparable harm and inadequate remedies at law. If the district court's analysis of irreparable harm and inadequate remedies at law is left uncorrected in this case, confusion in lower courts and among parties will ensue as to whether that aspect of the decision on review has merit.[34]

The Court should (1) confirm that irreparable harm and adequacy of monetary relief are *forward-looking* inquiries and cannot rest solely on *past* harm, (2) reaffirm that there is no presumption of irreparable harm or monetary inadequacy for ongoing infringement, and (3) clarify that mere uncertainty in damages calculations does not make monetary relief inadequate. Those principles will reaffirm that equitable relief depends on "the necessities of the particular case." *Trump v. CASA, Inc.*, 606 U.S. 831, 854 (2025) (citation omitted). And they will hew to the admonition that "the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Id.* (citation omitted).

---

[34] That matters in part because NPEs continue to seek, and receive, injunctions. *See* PATENT PROGRESS, *Injunctions Redux*, *supra* note 6 (noting based on data that when NPEs and PAEs prevailed on the merits and requested injunctions, they received them "86% of the time" and "72% of the time," respectively).

### A. The irreparable-harm and adequate-remedy factors require forward-looking harm that an injunction would remedy

An injunction requires "a real and immediate threat of future harm." *US Inventor, Inc. v. Squires*, __ F.4th __ , No. 24-2378, 2026 WL 2450313, at *3 (Fed. Cir. Aug. 21, 2026) (precedential) (cleaned up). That makes sense because an injunction cannot "remedy any past wrong." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (citation omitted). It is therefore error to find irreparable harm and inadequate monetary remedies exclusively from past harm that has no demonstrated likelihood of recurring. The Court should clarify that the first two *eBay* factors, properly understood, require showings of future harm and inadequate remedies for it.[35]

Here, the district court mistook discussions of past harm for the forward-looking analysis required for an injunction. *See* Appx28-36.[36] It relied

---

[35] The district court did properly treat Collision's failure to articulate a forward-looking harm as weighing against it on the balance of hardships, *see* Appx38-39, which would also suffice to affirm regardless of how the first two factors are considered.

[36] Though a minority, other courts awarding injunctive relief have also confused past and future harm. *See, e.g.*, *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F.Supp.2d 951, 983 (N.D. Cal. 2009) (criticizing *CSIRO v. Buffalo Tech., Inc.*, 492 F.Supp.2d 600, 603–06 (E.D. Tex. 2007), for this problem); *ePlus, Inc. v. Lawson Software, Inc.*, No. 9-cv-620, 2011 WL 2119410, at *12–13 (E.D. Va. May 23, 2011) (considering "past harm" and "past diversion of …

on Collision's loss of a supposed "'design-win' competition … with Samsung's in-house team" years before Collision stopped providing technical services itself. Appx32-33. But Collision provided no evidence it intended to engage in that market again, such that precluding infringement would avert the purported harm. Indeed, the district court identified no evidence that Collision was interested in anything other than licensing and asserting its patents for money going forward. To the contrary, Collision affirmatively did not intend to start developing technology again. Appx1078, Appx1103 (trial); Appx2170 (injunction hearing). And the district court identified no other harm an injunction would avert. The court also found no "particular or specific hardship [Collision] would face if an injunction were not to issue" when later evaluating the balance-of-hardships factor. Appx38-39.

The district court speculated that "a party's status as [a] non-practicing entity can be a transient one," Appx31, but identified no evidence that was the case here. The court also said there were not "'two classes' of patents," one for practitioners and one for non-practitioners. Appx32. But that confused the nature of the *right* (which depends on the grant, not the

resources" in finding irreparable harm and inadequacy of money damages).

plaintiff) with the *remedy* (which, as in all areas of the law, does depend on the nature of the injury to the party seeking relief).

The district court's approach conflicts with the principle that prospective relief must remedy the harm alleged. And it is out of step with precedent requiring that nonspeculative *future* injury be shown—the movant must be "likely to suffer irreparable harm without an injunction," and "the mere possibility or speculation of harm" is insufficient. *Wonderland Switzerland AG v. Evenflo Co.*, 162 F.4th 1346, 1358 (Fed. Cir. 2025) (cleaned up); *US Inventor*, 2026 WL 2450313, at *3; *see also Fleet Eng'rs, Inc. v. Mudguard Techs., LLC*, No. 2022-2001, 2023 WL 5219773, at *9 (Fed. Cir. Aug. 15, 2023) (affirming denial of injunction "without evidence of future harm"). Past harms are relevant only "as an indicator of the future." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 652 (Fed. Cir. 2015) (Reyna, J., concurring) (citing *United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952)); *see also ePlus, Inc. v. Lawson Software, Inc.*, 789 F.3d 1349, 1355–56 (Fed. Cir. 2015) (vacating injunction after patent was held invalid because there was "no longer any legal basis to enjoin [the] conduct" in the future); *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014) ("Although past wrongs may help establish the threat of a future injury, they are insufficient alone."); *cf. Trump v. California*, 609 U.S.

___, No. 26A124, 2026 WL 2473573, at *3 (Aug. 24, 2026) (finding no standing to seek injunctive relief based on "hypothetical future harm that is not certainly impending").

### B. Courts should not apply implicit or de facto presumptions in favor of irreparable harm or inadequate remedies at law

This Court has correctly reaffirmed that there is no presumption of irreparable harm. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) ("We … confirm that *eBay* jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief."); *Socket Sols., LLC v. Import Glob., LLC*, 185 F.4th 1150, 1156–57 (Fed. Cir. 2026) (same, in context of preliminary injunction). Most courts applying *eBay* have correctly required a plaintiff to affirmatively establish irreparable harm and inadequate remedies at law using evidence apart from the mere fact of ongoing infringement. But a few since *eBay* continue to apply an express presumption of irreparable harm.[37] And the court here adopted

[37] *See, e.g.*, *Crescent Servs., Inc. v. Mich. Vacuum Trucks, Inc.*, 714 F.Supp.2d 425, 431 (W.D.N.Y. 2010) (holding that "monetary damages are not an adequate remedy against future infringement because the principal value of a patent is its statutory right to exclude" (cleaned up)); *Smart Billiard Lighting, LLC v. Lucid Ball Sports, Inc.*, No. 23-cv-2457, slip op. at 2–3, (E.D.N.Y. July 10, 2023) (presuming irreparable harm); *Kiss Nail Prods., Inc. v. Shenzhen Jinri Elec. Appliance Co.*, No. 18-cv-5625, slip op. at 15 (E.D.N.Y.

reasoning that implicitly applied one.[38]

In finding irreparable harm and inadequacy of remedies at law, the district court accepted arguments that the infringement denied Collision "veto-power control," remained "ongoing," and was "against Collision's wishes." Appx32-34. Ongoing unwanted infringement is *necessary* for an injunction because equitable relief must be nonspeculative. But ongoing infringement alone cannot suffice to establish that future injury would be irreparable. The facts the district court relied on will *always* be true when an infringement plaintiff has prevailed on the merits and seeks injunctive relief in view of ongoing infringement. Weighing them in favor of irreparable harm would

---

July 23, 2020) (same); *Future Motion, Inc. v. Lai*, No. 23-cv-1742, slip op. at 9–10 (D. Or. June 24, 2025).

[38] A minority of other courts have also done so. *See, e.g.*, Order, *Rasmussen Instruments, LLC v. DePuy Synthes Prods., Inc.*, No. 20-cv-11807, slip op. at 7 (D. Mass. Mar. 30, 2023) (weighing mere fact of infringement as contributing to irreparable harm, and crediting vague notions of "lost business opportunity and damaged reputation"); Order, *Spanakos v. Aronson*, No. 17-cv-80965, slip op. at 16 (S.D. Fla. Jan. 3, 2019) (concluding only that "misuse of [the patent] will permanently damage the goodwill that could be associated with the patent"); *Smart Billiard*, slip op. at 2–3 ("having found … liability for patent infringement, the Court presumes that Plaintiff will suffer irreparable harm").

apply a presumption in all but name—in the absence of any other evidence, the factor would be met whenever infringement continues.

Moreover, this reasoning identifies a purported injury but fails to explain why it is irreparable or cannot be remedied with money damages—particularly where the plaintiff has demonstrated a willingness to forgo its statutory monopoly in exchange for license fees. The district court's weighing of Collision's generic arguments relating to impairment of its right to exclusivity, in the face of evidence demonstrating Collision was uninterested in exercising that right, amounts to an implicit presumption in favor of irreparable harm.

In addition to running afoul of *eBay*, and this Court's clarifications in *Bosch* and *Socket Solutions*, among others, that approach is inconsistent with recent Supreme Court precedent. Even where equitable relief would provide "[c]omplete" relief, complete relief is "not a guarantee—it is the maximum a court can provide." *CASA*, 606 U.S. at 853–54. Restoring presumptions (whether explicit or implied) on the irreparable-harm and inadequate-remedy factors would undermine that rule by pressing a "thumb on the scale" for the complete relief of an injunction to issue as a matter of course. *See*

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157–58 (2010) (rejecting implied presumptions).

### C. Uncertainty in damages calculations does not change the character of a harm that is intrinsically monetary

The district court erred as well by discounting undisputed evidence that Collision's ongoing interests are purely monetary—as evidenced by its licensing and seeking damages—and resting a finding of inadequate remedies on speculation that the amount of damages might be hard to calculate.[39]

The district court observed that "patents can be difficult to value" and "damages can be difficult to calculate," but those questions go to the reliability of the methodology for calculating the *amount* of damages, not *whether* a plaintiff's real interest is pecuniary. Appx32. Courts deal with uncertainty in damages calculations all the time because factual records are often complex. Uncertainty in the precise amount does not mean money alone cannot

[39] A minority of district courts have similarly downplayed evidence of licensing or other purely monetary interests. *See, e.g.*, *Waterton Polymer Prods. USA, LLC v. Edizone, LLC*, No. 12-cv-17, 2015 WL 1186258, at *8 (D. Utah Mar. 16, 2015) (finding inadequate remedies despite plaintiff's "consistent policy of licensing its patents"); *Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*, No. 04-cv-5172, 2009 WL 512156, at *11 (D.N.J. Feb. 27, 2009) (finding inadequate remedies despite plaintiff's interest being *only* in selling the patent itself, and having previously licensed it).

make a plaintiff whole. Moreover, the general notion that patents "*can be* difficult to value" or damages "*can be* difficult to calculate" has no specific relationship to the facts of *this* case, particularly where Collision presented its theory calculating damages down to the dollar at trial—as a running royalty—and the jury considered that evidence and awarded royalties in exactly the amount Collision requested. *See, e.g.*, Appx1982-1987 (1262:8–1264:1, 1267:19–25) (seeking $445,494,160); Appx705 (jury awarding same).

The district court also recognized that Collision's only *current* business is licensing and that it sought monetary relief for infringement. Appx35. But the court nonetheless erroneously concluded that did not show that monetary compensation was adequate, particularly where the record was devoid of evidence that Collision's business model is ever likely to change. The district court's approach was inconsistent with precedent, which recognizes a patentee's licensing-based model and pursuit of ongoing royalties as compelling indicators that money is adequate relief. *See, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1339–40 (Fed. Cir. 2012).

In cases like this, the very fact that the plaintiff's business model is licensing for money refutes any notion that harms from patent infringement are not compensable. For future infringement, entities like Collision suffer

only losses of royalties, and those losses are inherently compensable through monetary damages. The value of an injunction to Collision would be only as settlement leverage to increase the amount of money received.

## Conclusion

*eBay* has promoted innovation—it has not hindered it. Consistent with that, the Court should affirm the judgment. But in doing so, it should address the district court's erroneous reasoning on irreparable harm and inadequate remedies at law and should reaffirm that those factors require showings of future harm, are not presumptive, and require more than mere uncertainty in a damages calculation.

Respectfully submitted,

Ashurst Perkins Coie US LLP

/s/Andrew T. Dufresne
Andrew T. Dufresne

*Counsel for Amici Curiae High Tech Inventors Alliance, Software & Information Industry Association, Alliance for Automotive Innovation, and TechNet*

## Certificate of Compliance

1. This brief complies with the type-volume limitation of Federal Circuit Rule 29(b). Excluding the portions exempted by rule, the brief contains 5,556 words as counted by the word-processing software used to prepare it.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word software and 14-point Valkyrie A type.

Date: September 21, 2026

/s/Andrew T. Dufresne
Andrew T. Dufresne