**No. 2026-1893**

In the

# United States Court of Appeals for the Federal Circuit

**COLLISION COMMUNICATIONS INC.,**
*Plaintiff-Appellant*,

v.

**SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA INC.,**
*Defendants-Appellees*.

Appeal from the United States District Court for the Eastern District of Texas,
No. 2:23-cv-00587-JRG, Judge J. Rodney Gilstrap

## UNOPPOSED MOTION FOR LEAVE TO FILE BRIEF OF AMICI CURIAE ASSOCIATION FOR COMPETITIVE TECHNOLOGY (ACT) AND ENGINE ADVOCACY IN SUPPORT OF DEFENDANTS-APPELLEES

BRIAN SCARPELLI
ASSOCIATION FOR COMPETITIVE TECHNOLOGY
1401 K Street, NW
Suite 501
Washington, DC 20005
(517) 507-1446
bscarpelli@actonline.org
*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2026-1893

**Short Case Caption** Collision Communications, Inc. v. Samsung Electronics Co.

**Filing Party/Entity** Association for Competitive Technology (ACT); Engine Advocacy

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/21/2026 Signature: /s/ Brian Scarpelli

Name: Brian Scarpelli

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Association for Competitive Technology (ACT) | | |
| Engine Advocacy | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## MOTION FOR LEAVE TO FILE AMICUS BRIEF

Amici curiae the Association for Competitive Technology ("ACT") and Engine Advocacy ("Engine") respectfully move for leave to file the attached amicus brief in support of Defendants-Appellees Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. Counsel has discussed this motion with the parties. Defendants-Appellees and Plaintiff-Appellant consent to the filing of this motion.

### I. STATEMENT OF INTEREST

ACT is a global policy trade association for the small business technology developer community. The value of the U.S. ecosystem ACT represents—the app economy—is approximately $1.8 trillion and is responsible for 6.1 million American jobs, while serving as a key driver of the $8 trillion internet of things (IoT) revolution. ACT members lead the development of innovative applications and products across consumer and enterprise use cases.

Engine is a non-profit technology policy, research, and advocacy organization dedicated to bridging the gap between startups and policymakers. Engine works with government officials and thousands of high-technology, growth-oriented startups nationwide to support innovation and entrepreneurship through research, policy analysis, and advocacy.

ACT and Engine have a strong interest in ensuring that the equitable framework governing permanent injunctions in patent cases remains faithful to the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). Amici's members own patents, but they are also manufacturers, developers, standards implementers, customers of technology suppliers, and frequent targets of patent demands. For these firms, the threat of exclusion can impose costs dramatically disproportionate to the value of the patented technology—particularly after they have invested significant capital in developing and launching a complex product.

The proposed brief will assist the Court by explaining that affirmance does not require endorsing the district court's analysis of the first two *eBay* factors. The brief will explain that Collision's historical loss of a "design win" does not establish the prospective, causally related, noncompensable injury required for injunctive relief, particularly because Collision no longer competes in the relevant market and has no plans to return. It will further explain that the ordinary difficulty of valuing patents and calculating reasonable-royalty damages does not establish irreparable harm or the inadequacy of monetary remedies—especially where, as here, the patent holder sought and obtained substantial reasonable-royalty damages and requested an ongoing royalty as alternative prospective relief.

The proposed brief will also highlight the real-world consequences of

treating an injunction-induced negotiation as a superior measure of patent value. When an injunction threatens an already-developed, multicomponent product, the resulting bargain may reflect the implementer's sunk investments, switching costs, supply-chain disruption, and risk of exclusion rather than the incremental value of the patented technology. Small businesses are particularly vulnerable to that leverage because they often lack the resources to litigate, redesign products, or withstand an interruption in sales. Drawing on empirical evidence and examples from patent-assertion and standards-licensing disputes, the brief will demonstrate why weakening *eBay* would expose small technology companies to disproportionate litigation and exclusion risks without evidence that *eBay* has broadly harmed startup performance.

## II. CONCLUSION

For the foregoing reasons, amici ACT and Engine respectfully request that the Court grant this motion for leave to file the accompanying brief in support of Defendants-Appellees Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.

Respectfully submitted,

Dated: September 21, 2026

/s/ Brian Scarpelli
BRIAN SCARPELLI
ASSOCIATION FOR COMPETITIVE TECHNOLOGY
1401 K Street, NW
Suite 501
Washington, DC 20005
(517) 507-1446
bscarpelli@actonline.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel for amici curiae certifies that this motion:

(1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because it contains 530 words, excluding the parts exempted by Federal Rule of Appellate Procedure 27(d)(2), Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2); and

(2) complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because this document has been prepared using Microsoft Office Word and is set in the Times New Roman font in a size equivalent to 14 points or larger.

Dated: September 21, 2026

/s/ Brian Scarpelli
Brian Scarpelli
*Counsel for Amici Curiae*

**No. 2026-1893**

In the

United States Court of Appeals
for the Federal Circuit

---

**COLLISION COMMUNICATIONS INC.,**
*Plaintiff-Appellant*,

v.

**SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA INC.,**
*Defendants-Appellees*.

---

Appeal from the United States District Court for the Eastern District of Texas,
No. 2:23-cv-00587-JRG, Judge J. Rodney Gilstrap

---

# BRIEF OF THE ASSOCIATION FOR COMPETITIVE TECHNOLOGY (ACT) AND ENGINE ADVOCACY AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES

---

BRIAN SCARPELLI
ASSOCIATION FOR COMPETITIVE TECHNOLOGY
1401 K Street, NW
Suite 501
Washington, DC 20005
(517) 507-1446
bscarpelli@actonline.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... **IV**

**INTEREST OF AMICI CURIAE** .......... **1**

**SUMMARY OF ARGUMENT** .......... **2**

**ARGUMENT** .......... **5**

I. THE DISTRICT COURT PROPERLY REJECTED COLLISION'S PROPOSED CATEGORICAL RULES, BUT ITS ADOPTION OF THE DOJ/PTO ANALYSIS REQUIRES CLARIFICATION .......... 5

II. THE DISTRICT COURT'S "DESIGN WIN" ANALYSIS DOES NOT IDENTIFY THE PROSPECTIVE IRREPARABLE HARM REQUIRED BY *EBAY'S* FIRST FACTOR .......... 7

A. A Past Commercial Injury Does Not Become Permanently Irreparable Merely Because Its Consequences Were Significant .......... 7

B. Collision Does Not Compete in Any Present Market and Has No Plans to Return .......... 8

C. Collision Did Not Establish That Samsung's Infringement Caused Its Alleged Commercial Harm .......... 11

III. DIFFICULTY VALUING A PATENT DOES NOT ESTABLISH THE INADEQUACY OF MONETARY REMEDIES .......... 12

A. The District Court's Valuation Rationale Would Make the Second *eBay* Factor Nearly Automatic .......... 12

B. Other Available Remedies Mitigate the Valuation Concerns Identified by the DOJ/PTO .......... 14

C. Collision's Own Requested and Obtained Relief Shows That Its Injury Is Licensing Compensation .......... 15

D. The Abstract Loss of "Veto-Power Control" Cannot Independently Establish the Inadequacy of Monetary Relief .......... 16

IV. A NEGOTIATION CONDUCTED UNDER THE THREAT OF EXCLUSION IS NOT AN ACCURATE MARKET TEST OF PATENT VALUE .......... 17

V. *WEAKENING EBAY* WOULD HARM SMALL BUSINESSES ON THE RECEIVING END OF PATENT ASSERTIONS .......... 20

A. Injunction Threats Can Impose Disproportionate Transaction Costs on Small Businesses .......... 21

B. Real-World Patent Assertion Strategies Demonstrate How Litigation Costs Enable Nuisance Litigation and Coercive Settlements .......... 24

C. Empirical Evidence Does Not Establish That *eBay* Has Broadly Harmed Venture-Backed Startups .......... 25

VI. STANDARDS ILLUSTRATE THE PUBLIC-INTEREST RISKS OF DISPROPORTIONATE INJUNCTION LEVERAGE .......... 26

A. Standardization Can Create Technological and Commercial Lock-In, Giving SEP Owners Additional Leverage .......... 26

B. Small Implementers Are Already Poorly Positioned to Evaluate and Contest Licensing Demands .......... 29

C. Injunction Risk Can Discourage Standards Adoption and Market Participation .......... 30

**CONCLUSION .......... 31**

**CERTIFICATE OF COMPLIANCE .......... 34**

## TABLE OF AUTHORITIES

### CASES

*Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008) .............................. 14, 15

*Apple Inc. v. Samsung Electronics Co.*, 809 F.3d 633 (Fed. Cir. 2015)..................... 9

*Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325 (Fed. Cir. 2013) .......................... 9

*City of Los Angeles v. Lyons,* 461 U.S. 95 (1983)..................................................... 9

*Collision Commc'ns, Inc. v. Samsung Elecs. Co.*, No. 2:23-cv-00587-JRG (E.D. Tex. May 18, 2026)........................................................................................passim

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)................................passim

*Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011) .......................... 22

*Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201 (Fed. Cir. 2014)......................... 19

*Garretson v. Clark*, 111 U.S. 120 (1884) ................................................................. 13

*Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378 (Fed. Cir. 2017) 11

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012).......... 4

*Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) .......... 13

*Murthy v. Missouri*, 603 U.S. 43 (2024) .................................................................... 9

Nichia Corp. v. Everlight Ams., Inc., 855 F.3d 1328 (Fed. Cir. 2017) .................... 10

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005)................... 19

*Ortiz & Assocs. Consulting, LLC v. Vizio, Inc.,* 2025 WL 3653227 (Fed. Cir. Dec. 17, 2025) ............................................................................................................ 22

*Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293 (Fed. Cir. 2007) .................... 3, 14

*Robert Bosch LLC v. Pylon Manufacturing Corp.*, 659 F.3d 1142 (Fed. Cir. 2011) 3, 5, 10

*State of Washington v. Landmark Technology A, LLC*, No. 2:21-cv-00728-RSM (W.D. Wash. Jan. 14, 2025) ......................................................................... 24

*XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282 (Fed. Cir. 2018) .......... 14

**STATUTES**

35 U.S.C. § 283 .......... 18

35 U.S.C. § 284 .......... 15, 16

**OTHER AUTHORITIES**

ASS'N FOR COMPETITIVE TECH., STATE OF THE APP ECONOMY (2022), https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL.pdf. .......... 1

Case COMP/M.6381 –Google/Motorola Mobility, Commission Decision at ¶ 107 (Feb. 13, 2012). .......... 28

Christian Helmers & Brian J. Love, *Injunctions and Venture Capital: An Empirical Look at eBay's Effect on Startups* (16 N.Y.U. J. INTELL. PROP. & ENT. L., forthcoming 2027). .......... passim

Eur. Comm'n, Commission Staff Working Document: Impact Assessment Report (Apr. 27, 2023) .......... 30

Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition* 5 (2011) .......... 20

*InterDigital Tech. Corp. v. Lenovo Group Ltd.* [2023] EWHC 539 (Pat) (Mar. 16, *rev'd in part on other grounds*, [2024] EWCA Civ 743 .......... 30

Joachim Henkel, *Licensing Standard-Essential Patents in the IoT*, 51 RES. POL'Y 1, 7 (2022). .......... 30

John Hayes & Assaf Zimring, *Injunctions in Litigation Involving SEPs*, 6/2024 GRUR PATENT 240 (2024) .......... 28, 29

*Optis Cellular Tech. LLC v. Apple Inc.* [2023] EWHC 1095 (Ch) (May 10, *rev'd in part on other grounds*, [2025] EWCA Civ 552. .......... 30

Press Release, Research In Motion Ltd., Research In Motion and NTP Sign Definitive Settlement Agreement to End Litigation (Mar. 3, 2006) .......... 19

Statement of Interest of the United States, *Collision Comm'ns, Inc. v. Samsung Elecs. Co.*, No. 2:23-cv-00587-JRG (E.D. Tex. Feb. 27, 2026). .......... 17, 26

Thomas F. Cotter, Erik Hovenkamp & Norman Siebrasse, *Demystifying Patent Holdup*, 76 WASH. & LEE L. REV. 1501 (2019). .................................................. 27

U.S. Dep't of Just. & U.S. Pat. & Trademark Off., *Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments* (Jan. 8, 2013) (withdrawn Dec. 19, 2019) .......................................................... 28

## INTEREST OF AMICI CURIAE

The Association for Competitive Technology (ACT) is a global policy trade association for the small business technology developer community.[1] The U.S. app economy ACT represents is valued at approximately $1.8 trillion, supports 6.1 million American jobs, and is a key driver of the $8 trillion internet of things (IoT) revolution.[2] ACT members lead the development of applications and products across consumer and enterprise use cases.

Engine Advocacy (Engine) is a non-profit technology policy, research, and advocacy organization dedicated to bridging the gap between startups and policymakers. Engine works with government officials and thousands of high-technology, growth-oriented startups nationwide to support innovation and entrepreneurship.

Amici have a strong interest in ensuring that the framework governing permanent injunctions remains faithful to *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). Amici's members own patents, but they are also manufacturers, developers, standards implementers, customers of technology suppliers, and frequent targets of

---

[1] No party or party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money that was intended to fund its preparation or submission. No person other than amici, their members, or their counsel contributed money that was intended to fund the preparation or submission of this brief. This brief is accompanied by a motion for leave to file.

[2] Ass'n for Competitive Tech., State of the App Economy (2022), https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL.pdf.

patent demands. For these firms, the threat of exclusion can impose costs dramatically disproportionate to the value of the patented technology—particularly after they have invested heavily in developing and launching a complex product.

## SUMMARY OF ARGUMENT

The district court correctly rejected Collision's request for rules that would make continuing infringement, the existence of a patent right, or the general public interest in patent enforcement effectively dispositive under *eBay*. But the court accepted several propositions advanced by the Department of Justice (DOJ) and Patent and Trademark Office (PTO) concerning irreparable harm and the inadequacy of monetary relief, which warrant clarification on appeal. *See generally Collision Commc'ns, Inc. v. Samsung Elecs. Co.*, No. 2:23-cv-00587-JRG (E.D. Tex. May 18, 2026).

First, the district court's "design win" analysis does not identify the prospective irreparable harm required by *eBay*. The court found that Collision's historical loss of a "design win" constitutes irreparable harm. *Id.* at 9–10. Because the alleged design competition occurred years ago, an injunction cannot award Collision the design win it did not receive or restore it to a market it has left and has no plans to reenter. Nor did Collision establish that Samsung's alleged infringement caused Collision to lose the design win or exit the market. The relevant prospective injury is continued uncompensated use during the patent's remaining term, which an

ongoing royalty can remedy. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314–15 (Fed. Cir. 2007).

Second, the district court's acceptance that a non-practicing entity (NPE) can establish irreparable harm and the inadequacy of monetary remedies simply because patents are "difficult to value" and infringement damages are "difficult to calculate" is incorrect. *See Collision Commc'ns*, slip op. at 8, 10–12. That reasoning risks making *eBay*'s first two factors nearly automatic. Reasonable-royalty determinations routinely involve some uncertainty, which may affect the damages amount but does not establish that compensation is incapable of remedying the injury. If ordinary valuation difficulty established irreparable harm, virtually every plaintiff could satisfy eBay's first two factors, recreating something close to the general rule *eBay* rejected. *See Robert Bosch LLC v. Pylon Manufacturing Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) (applying *eBay*).

Collision's own conduct provides powerful evidence that its asserted injury is compensable. Collision proposed royalty-bearing agreements, sought reasonable-royalty damages, presented expert testimony quantifying those damages, obtained a jury award of approximately $445 million, and requested an ongoing royalty as alternative prospective relief. *Collision Commc'ns*, slip op. at 1–2. Those facts do not categorically bar an injunction.

Third, an injunction-induced negotiation is not necessarily a reliable market

test of patent value. A bargain struck after a manufacturer has designed, manufactured, and launched a complex product can reflect redesign costs, lost sales, supply-chain disruption, and the risk of exclusion, not merely the invention's incremental value. That concern is especially relevant where a patent covers only one feature of a multicomponent product. *See eBay*, 547 U.S. at 396–97 (Kennedy, J., concurring); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). The resulting leverage may allow the patentee to capture value attributable to the implementer's sunk investments and complementary technologies.

Small businesses bear these risks disproportionately. They often lack large defensive portfolios, in-house patent counsel, and the resources for prolonged litigation or post-launch redesign. When defending a claim costs more than the license sought, a small company may rationally settle regardless of infringement, validity, or the patent's actual value.[3]

Although this case does not involve a standard-essential patent (SEP), technical standards illustrate the broader economic mechanism at issue. Once a product is designed around Wi-Fi, Bluetooth, cellular connectivity, or another standard, switching may be commercially impracticable, and exclusionary leverage

[3] Christian Helmers & Brian J. Love, *Injunctions and Venture Capital: An Empirical Look at eBay's Effect on Startups*, SSRN at 4–5, 41 (16 N.Y.U. J. INTELL. PROP. & ENT. L., forthcoming 2027), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=7329598.

can then reflect the value of interoperability and sunk investment rather than the value of a particular patent.

The Court should affirm the denial of Collision's requested injunction and, in doing so, clarify that (1) a historical commercial loss must be connected to a prospective, causally related injury that an injunction can redress; (2) valuation and damages-calculation difficulties do not themselves establish irreparable harm or inadequate legal remedies; and (3) bargaining leverage attributable to exclusion distorts patent value.

## ARGUMENT

### I. THE DISTRICT COURT PROPERLY REJECTED COLLISION'S PROPOSED CATEGORICAL RULES, BUT ITS ADOPTION OF THE DOJ/PTO ANALYSIS REQUIRES CLARIFICATION

A permanent injunction is an extraordinary equitable remedy. A patentee must prove that it suffered an irreparable injury, the inadequacy of legal remedies, that the balance of hardships warrants equitable relief, and that the public interest would not be disserved. *eBay*, 547 U.S. at 391. Section 283 confirms that a court may grant an injunction only "in accordance with the principles of equity." 35 U.S.C. § 283. A prevailing patentee therefore cannot rely on shortcuts to obtain injunctive relief. *Robert Bosch*, 659 F.3d at 1148–49.

Collision assembles several propositions that, if accepted, would negate *eBay* entirely. It argues that ongoing infringement is traditionally considered irreparable,

that money cannot replace a patentee's control over its invention, that stopping unlawful conduct is not a cognizable hardship, and that the public generally benefits when patent rights are enforced. Although each proposition is framed as noncategorical, their combined effect would leave little work for the four-factor test.

The district court properly rejected Collision's broadest arguments. It held that continuing infringement does not automatically establish irreparable harm, a patentee must identify an actual harm that will result if an injunction is denied, and the general public interest in patent enforcement does not automatically satisfy the fourth factor. *Collision Commc'ns*, slip op. at 5–6, 14–17. Those rulings follow *eBay*'s insistence on a case-specific exercise of equitable discretion. 547 U.S. at 393–94.

But the court's analysis of *eBay*'s first two factors requires clarification. Although an NPE is not categorically barred from obtaining an injunction, the court relied on the alleged difficulty of valuing patents and calculating damages, Collision's historical loss of a design-win opportunity, and Samsung's continued use of the technology to find irreparable harm and inadequate legal remedies. *Id.* at 7–12. Those considerations did not establish a prospective, causally related injury that an injunction could remedy but monetary relief could not.

Affirmance does not require adopting the district court's reasoning on every factor. The Court should affirm the denial of equitable relief while clarifying, for the reasons explained below, that factors one and two were not established here.

## II. THE DISTRICT COURT'S "DESIGN WIN" ANALYSIS DOES NOT IDENTIFY THE PROSPECTIVE IRREPARABLE HARM REQUIRED BY *EBAY'S* FIRST FACTOR

### A. A Past Commercial Injury Does Not Become Permanently Irreparable Merely Because Its Consequences Were Significant

Collision alleges that it sought a design win by persuading Samsung to incorporate Collision's technology into its products under a royalty-bearing agreement. *Collision Commc'ns*, slip op. at 9. Collision further alleges that Samsung ended the negotiations, implemented the technology without a license, and deprived Collision of the incumbency, validation, and follow-on opportunities associated with selection. *Id.*; Appx1071–1078. Those allegations may describe a serious historical commercial injury, but they do not identify a prospective injury that the requested injunction can repair. The relevant distinction is among (1) past injury—the loss of the original design-win opportunity and associated commercial consequences; (2) present injury—uncompensated continued use of the patent during its remaining term; and (3) the available remedy—an ongoing royalty for future use.

Whatever injury Collision suffered from losing the design-win opportunity occurred years ago. A prospective injunction cannot award Collision the design win it did not receive, reconstruct the parties' former negotiations, restore the employees Collision dismissed, or recreate a supplier relationship that no longer exists. Because

equitable relief is prospective, a theory that rests on the consequences of an opportunity that has already passed cannot by itself support an injunction.

The district court nevertheless treated Collision's lost design win, considered alongside Samsung's continued use of the technology, as sufficient to establish irreparable harm. *Collision Commc'ns*, slip op. at 9–10. That analysis does not explain what present injury an injunction would remedy. If its practical effect is to force a larger payment for continued use, the claimed "design-win" injury is really a dispute over the amount of monetary compensation, which a forward-looking royalty can address, rather than an irreparable prospective competitive injury.

That monetary relief cannot recreate a past opportunity does not alter that conclusion, because an injunction cannot recreate the opportunity either. The relevant inquiry is not whether either remedy can undo the past, but whether monetary relief can compensate Collision for the prospective injury that remains.

### B. Collision Does Not Compete in Any Present Market and Has No Plans to Return

The district court also did not identify a present product market in which Collision and Samsung compete. Collision does not currently sell a device displaced by Samsung's products, so the requested injunction would not protect current market share, prevent price erosion, preserve manufacturing capacity, or stop the diversion of customers from Collision to Samsung. Those facts do not categorically foreclose

relief, but they bear directly on whether Collision faces an ongoing competitive injury. *See Apple Inc. v. Samsung Electronics Co.*, 809 F.3d 633, 639–40 (Fed. Cir. 2015) (requiring "some causal nexus" between the infringement and the alleged irreparable harm).

Even if Collision's historical design-win theory were credited, it cannot establish the prospective injury necessary to support an injunction. Collision testified that it had left the technology-development market, had no employees, had no business plans apart from patent enforcement, and had no plans to reenter the market. Appx1078, Appx1103. Equitable relief must address a threatened future injury, not an injury that has already occurred and is not likely to recur. *See Murthy v. Missouri*, 603 U.S. 43, 59 (2024); *see also City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983).

This Court's design-win cases confirm the distinction between a completed commercial loss and a continuing competitive injury. In *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325 (Fed. Cir. 2013), the Court found irreparable harm because the defendant's success in a design-win competition caused Broadcom "ongoing" harm in the form of "diminished market share going forward and a disadvantage in future design-win competitions." *Id.* at 1336. Those harms were continuing because Broadcom remained in the market and would continue to compete for future design wins.

Here, by contrast, Collision has no plans to participate in any future design-win competitions. An injunction would not enable Collision to reenter the market or restore its competitive position.

The district court also relied on Samsung's continued use of the patented technology over Collision's objection. *Collision Commc'ns*, slip op. at 9. Ongoing or prospective infringement is a necessary predicate for prospective relief, but it does not itself prove irreparable harm, and the patentee still must show that, without an injunction, it will suffer an injury that monetary relief cannot repair. *See Robert Bosch*, 659 F.3d at 1148–49; *Nichia Corp. v. Everlight Ams., Inc.*, 855 F.3d 1328, 1340–41 (Fed. Cir. 2017).

Collision's theory thus conflates its past injury (the lost design win), the alleged prospective infringement (Samsung's continued use), and the inadequacy of monetary relief, which Collision must independently establish; the first two do not establish the third. Collision must identify a present, noncompensable injury that the requested injunction—not merely greater negotiating leverage—would redress.

Allowing a historical design-win narrative to establish continuing irreparable harm would also provide an easily replicated route around *eBay*. A former operating company could identify an unsuccessful commercialization effort, characterize it as a lost design win, invoke difficult-to-quantify benefits such as validation and incumbency, and obtain exclusionary leverage years after it ceased competing in the relevant market. The necessary safeguard is a demonstrated connection between the relief requested and the prospective injury asserted.

### C. Collision Did Not Establish That Samsung's Infringement Caused Its Alleged Commercial Harm

The causation requirement independently forecloses Collision's design-win theory. "There must be proof that the infringement causes the harm that the patentee alleges is irreparable." *Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1383 (Fed. Cir. 2017) (citation omitted). Collision's own evidence severs any causal link between Samsung's alleged infringement, the lost partnership, and Collision's exit from the market.

Samsung rejected Collision's proposed partnership in March 2014—one year before Samsung's alleged infringement began in April 2015. Appx1071; Appx1473. Samsung therefore could not have caused Collision to lose the proposed partnership through conduct that had not yet begun. Collision's Chief Operating Officer testified that it was Nokia's decision to withdraw funding in 2018 that "devastated" Collision and forced it to "shut down [its] research and development operations." Appx945; Appx1078. Collision's speculation that it might have survived if Samsung had taken a license, Appx2072–2074, is insufficient to establish that Samsung's infringement caused the commercial injuries on which Collision relies. *See Genband*, 861 F.3d at 1383.

Accordingly, this Court should affirm the denial of an injunction while clarifying that Collision failed to establish *eBay*'s first factor. A historical commercial injury supports prospective equitable relief only when the patentee demonstrates that

the infringement is causing a continuing, noncompensable injury that the requested injunction can redress. Collision made no such showing: the alleged design-win opportunity has passed, Collision no longer competes in the relevant market, and the record does not establish that Samsung's infringement caused Collision's asserted commercial injuries.

## III. Difficulty Valuing a Patent Does Not Establish the Inadequacy of Monetary Remedies

### A. The District Court's Valuation Rationale Would Make the Second *eBay* Factor Nearly Automatic

The district court expressly adopted the DOJ/PTO's reasoning that an NPE can establish irreparable harm and inadequate legal remedies because patents may be hard to value and patent damages may be difficult to calculate. *Collision Commc'ns*, slip op. at 8, 10–12.

Valuation uncertainty does not answer the equitable question. Reasonable-royalty determinations routinely involve uncertainty, and if ordinary valuation difficulty established inadequate legal relief, virtually every patent owner seeking an injunction could satisfy the second *eBay* factor. Valuation uncertainty may affect how a court calculates compensation, but it does not establish that compensation is incapable of redressing the injury. Courts and juries routinely resolve patent-valuation disputes and award reasonable royalties despite those difficulties.

The district court's reasoning, drawn from the DOJ/PTO Statement of Interest, rests on the premises that patents are unique, that patent valuation can be difficult,

that reasonable-royalty calculations can be uncertain, that damages verdicts are sometimes reversed because of flawed methodologies, and that future conditions can complicate the calculation of an ongoing royalty. None of those propositions demonstrates that monetary relief is inadequate; they show only that determining the appropriate amount may require evidence and judgment—the ordinary work of damages adjudication. A court may imperfectly estimate a reasonable royalty, but an injunction-induced negotiation can produce an even more distorted figure if the patent holder can threaten losses unrelated to the patented invention.

The difficulty of proving a royalty therefore cannot itself become a basis for injunctive relief. A patentee is entitled to a reasonable royalty from an infringer but must provide evidence tying the award to the value of the patented feature and excluding the value of everything else in the accused product. *Garretson v. Clark*, 111 U.S. 120, 121 (1884); *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). But as a patent adds less to a product, it becomes harder to demonstrate that the patent holder is entitled to a substantial reasonable royalty. Making that difficulty of proof a basis for injunctive relief means converting weakness into leverage and allowing a feature too small to value to command a higher royalty than one substantial enough to apportion. *See eBay, 547 U.S. at 396–97 (Kennedy, J., concurring).*

The relevant comparison is therefore not imperfect judicial valuation versus perfect market valuation, but imperfect judicial valuation versus what Collision's near-automatic-injunction regime would produce: a bilateral negotiation potentially

distorted by switching costs, sunk investments, litigation costs, and exclusion risk. The existence of those distortions confirms that valuation difficulty is not a reason to presume that negotiation under threat of exclusion will produce a more accurate measure of the patent's value.

### B. Other Available Remedies Mitigate the Valuation Concerns Identified by the DOJ/PTO

Modern courts can award reasonable royalties, supplemental damages, ongoing royalties, and, in appropriate circumstances, enhanced damages. *See* 35 U.S.C. § 284; *Paice, 504 F.3d at 1314–15*. An ongoing royalty is not simply the jury's pre-verdict rate carried forward. In determining prospective compensation, a court may account for the change in the parties' bargaining positions and economic circumstances that follows a judgment of infringement. *See Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361–62 (Fed. Cir. 2008); *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297 (Fed. Cir. 2018). Consistent with that approach, courts denying injunctions have routinely imposed ongoing royalties that exceed the pre-judgment royalty rate, and one study reports a median ongoing/pre-judgment royalty ratio of approximately 1.34.[4]

These remedies undermine the suggestion that denying an injunction necessarily permits an infringer to continue using patented technology for the same price.

[4] HELMERS & LOVE, SUPRA NOTE 3, AT 19–20.

The availability of an ongoing royalty also answers the historical "multiplicity of suits" rationale on which Collision relies, because a court-ordered royalty for future use makes repeated suits over continuing infringement unnecessary. Section 284 separately authorizes enhanced damages for willful infringement, and a court setting an ongoing royalty may also take the infringer's post-verdict conduct into account. *See* 35 U.S.C. § 284; *Amado*, 517 F.3d at 1362. The availability of these remedies does not categorically preclude an injunction, but it weakens the premise that uncertainty about future compensation necessarily makes legal relief inadequate.

### C. Collision's Own Requested and Obtained Relief Shows That Its Injury Is Licensing Compensation

Collision proposed royalty-bearing agreements during negotiations, sought reasonable-royalty damages, presented expert evidence quantifying those damages, obtained a jury award of approximately $445 million, and requested an ongoing royalty as an alternative form of prospective relief. *Collision Commc'ns*, slip op. at 1–2. Collision now operates through patent assertion and licensing rather than by supplying a competing downstream product.

None of those facts alone bars an injunction, but together they show that the asserted injury is economic and measurable through the same licensing framework Collision selected. Collision cannot establish the inadequacy of monetary relief merely by observing that the precise amount of prospective compensation remains disputed. That dispute concerns how much Samsung must pay, not whether payment

can compensate Collision for Samsung's continued use.

Thus, the mere proposition that patent valuation is difficult should not itself transform a compensable licensing injury into irreparable harm.

### D. The Abstract Loss of "Veto-Power Control" Cannot Independently Establish the Inadequacy of Monetary Relief

The district court also credited Collision's argument that monetary relief could not adequately protect its "veto-power control" over the patented technology, drawing on Chief Justice Roberts's observation about "the difficulty of protecting a right to exclude through monetary remedies." *See Collision Commc'ns*, slip op. at 10–12; *eBay*, 547 U.S. at 395 (Roberts, C.J., concurring). But the same concurrence stressed that the historical practice of granting injunctions "does not entitle a patentee to a permanent injunction or justify a general rule that such injunctions should issue." *Id.* Justice Kennedy, writing for four Justices, added that the historical practice arose in circumstances unlike those presented when firms use patents "primarily for obtaining licensing fees." *Id.* at 396 (Kennedy, J., concurring).

Every infringement deprives a patentee of some degree of control over its invention. If loss of that control itself established irreparable harm or the inadequacy of damages, the statutory right to exclude would automatically satisfy the first two factors in every case, collapsing the distinction the Supreme Court drew between a patent right and the remedy for its infringement. *See eBay*, 547

U.S. at 392. Congress made injunctions discretionary under 35 U.S.C. § 283, and a rule under which money is inadequate whenever it cannot reproduce the abstract power to veto use would bring back, under another name, the general rule *eBay* rejected.

The Court should therefore clarify that neither ordinary valuation difficulty nor the abstract loss of control inherent in every act of infringement establishes the inadequacy of legal remedies. Where, as here, the asserted prospective injury is continued use for which the patentee has sought and proposed licensing compensation, the patentee must identify a concrete reason why an appropriately determined ongoing royalty cannot provide adequate relief. Collision did not do so.

## IV. A NEGOTIATION CONDUCTED UNDER THE THREAT OF EXCLUSION IS NOT AN ACCURATE MARKET TEST OF PATENT VALUE

The government suggested that an injunction can encourage the parties to negotiate privately rather than require a court to estimate a royalty. Statement of Interest of the United States at 9–10, *Collision Commc'ns, Inc. v. Samsung Elecs. Co.*, No. 2:23-cv-00587-JRG (E.D. Tex. Feb. 27, 2026). It further asserted that an appropriately scoped injunction "leaves it to the parties, rather than courts, to determine the value of the technology." *Id.* at 10. But replacing judicial valuation with private negotiation does not eliminate valuation error. The economic significance of any negotiated amount depends on the leverage each party possesses and the circumstances in which the bargain occurs.

A negotiation conducted under the threat of shutting down an already-developed complex product is not equivalent to an ex-ante negotiation over the value of a technological input. Before a technology is selected, competing alternatives may constrain the price. After a manufacturer has designed a product, built production and distribution systems, obtained customers, and integrated numerous technological inputs, switching can be costly or impossible within the relevant time. An injunction threatened at that point enables the patentee to bargain over not only the invention but also the implementer's investments and the disruption that exclusion would cause.

The resulting price may therefore reflect the value of avoiding exclusion—redesign costs, interrupted manufacturing, lost sales, customer obligations, supply-chain disruption, and litigation risk. Those values derive largely from the defendant's own investments and complementary technologies, not from the patented contribution. An agreement reached under those conditions is not a reliable measure of the patented contribution's value.

The concern is strongest when a patented feature represents only a portion of a complex device, particularly because a complex product may incorporate thousands of patented technologies. As recognized in *eBay*, "when the patented invention is but a small component of the product the companies seek to produce," the threat of an injunction may be used for "undue leverage in negotiations," even

though money damages would be sufficient. 547 U.S. at 396–97 (Kennedy, J., concurring). This Court has generally required reasonable-royalty damages to reflect the value attributable to the patented feature rather than the value of the entire product. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). An injunction-induced negotiation can circumvent that limitation by placing the entire product—and the associated investments—at risk.

The BlackBerry litigation illustrates how an injunction threatening a complex product can alter the bargaining range. NTP, Inc., an NPE, obtained a verdict of $23,188,570.90 against Research in Motion (RIM), the maker of BlackBerry, later increased to $53,704,322.69 with prejudgment interest and enhanced damages. *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1291–92 (Fed. Cir. 2005). The district court also entered a permanent injunction, stayed pending appeal, that threatened the whole BlackBerry email system. After this Court largely affirmed the infringement verdict, RIM paid $612,500,000 to settle the case and avoid the injunction,[5] even though the PTO had by then issued preliminary rejections of the asserted claims in reexamination. That payment was more than eleven times the enhanced judgment. The comparison is imperfect because the settlement also covered future use, but the disparity shows how exclusion risk can change the

[5] Press Release, Research In Motion Ltd., Research In Motion and NTP Sign Definitive Settlement Agreement to End Litigation (Mar. 3, 2006).

bargaining range.

Empirical research confirms that the threat of an injunction can lead to royalty rates that "exceed a natural benchmark range based on the value of the patented technology and the strength of the patent."[6] Injunction analysis should not permit a patentee to obtain through bargaining leverage the unrelated product value that damages law excludes. The government recognized the same dynamic in a Federal Trade Commission study on patent remedies.[7]

This does not mean that an NPE can never establish irreparable harm or that private negotiation is always unreliable. The point is narrower: when a patentee does not sell a competing product and its present injury is unpaid use, a court should demand a concrete explanation of what exclusion would remedy that an appropriately calibrated royalty cannot. The opportunity to obtain a larger payment through exclusionary leverage is not itself an irreparable injury. A court therefore should not treat the additional negotiating power created by an injunction as evidence that monetary compensation was inadequate—or as a superior measure of the patent's value.

## V. *WEAKENING EBAY* WOULD HARM SMALL BUSINESSES ON THE RECEIVING END OF PATENT ASSERTIONS

[6] HELMERS & LOVE, *supra* note 3, at 9.
[7] Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition* 5–8, 217–35 (2011).

The United States emphasized that strong exclusion rights can protect small inventors negotiating with larger firms. Statement of Interest at 2–5. That perspective captures only one side of the innovation ecosystem. Small technology companies may own patents, but they also develop multicomponent products, purchase third-party technology, and receive patent demands. The relevant policy question is the net effect of stronger injunction threats across all of those roles.

### A. Injunction Threats Can Impose Disproportionate Transaction Costs on Small Businesses

Litigating patent cases is extraordinarily expensive. According to the American Intellectual Property Law Association, district court legal fees can exceed $3.5 million when significant value is at risk and $4 million when the patent holder is also an NPE.[8] Those expenses divert capital and personnel from engineering, hiring, security, compliance, and market entry.

For small businesses, these costs can be existential. When the cost of defending against a claim exceeds the economic value of taking a license, a small company may rationally pay a license fee regardless of its view of infringement, validity, or the appropriate royalty. The litigation between KPN and Bullitt, a small device manufacturer, illustrates that mismatch. Bullitt calculated the maximum royalty at issue to be roughly $1,080, based on KPN's portfolio-wide rate—which

---

[8] *Id.* at 33, 36.

covered more than the asserted patent—and the number of implicated units. Because litigating infringement, validity, essentiality, and fair, reasonable, and non-discriminatory (FRAND) issues would have cost far more than the roughly $1,080 at stake, Bullitt tried to resolve the limited-sales issues first. About two years after the litigation ended, Bullitt failed and entered administration, a UK insolvency process. Although the record does not establish that the KPN litigation caused Bullitt's financial distress, its experience illustrates the vulnerability of small businesses when the cost of testing a patent demand vastly exceeds the value of the asserted claim.

A credible injunction threat would magnify these costs, because a small business facing possible exclusion from the market must either defend against even meritless or overreaching claims or pay to avoid that risk. This Court defined "a nuisance value settlement demand [as] a demand that is less than it would cost the opposing party to defend against the action." *Ortiz & Assocs. Consulting, LLC v. Vizio, Inc., No. 2024-1783*, slip op. at 8 n.5 (Fed. Cir. Dec. 17, 2025). As this Court recognized in Eon-Net *LP v. Flagstar Bancorp*, patentees can exploit "the high cost to defend complex litigation to extract a nuisance value settlement." 653 F.3d 1314, 1327 (Fed. Cir. 2011). Given that high cost, "nuisance" does not equate to "small"—particularly when the large number of existing patents and NPEs can multiply the threat.

Growth makes a successful company a more attractive patent target. Early-stage startups may have little revenue worth pursuing. Once they raise substantial financing, obtain major customers, launch successful products, announce an acquisition, or approach an IPO, the economics of assertion change. At the point when a startup's innovation begins producing commercial value, patent assertions can divert that capital away from continued innovation.

A recent study found evidence that patent demands are common among venture-backed companies, and survey research reports that 70% of venture capitalists had portfolio companies that received patent demands.[9] Patent owners can exploit procedural barriers and defense costs, and small businesses may settle because they cannot afford to establish noninfringement or invalidity, not because the demanded license reflects the patent's value.

The burden of evaluating and responding to patent demands is particularly acute for small companies that incorporate standardized technologies into their products. As explained further in Section VI, requiring downstream companies to become expert licensing negotiators, skilled in evaluating complex technologies, merely to operate their businesses would be unworkable and would undermine incentives for such companies to deploy standardized technologies, to innovate on top of them, and to extend U.S. leadership in the connected economy.

---

[9] HELMERS & LOVE, *supra* note 3, at 15–16.

### B. Real-World Patent Assertion Strategies Demonstrate How Litigation Costs Enable Nuisance Litigation and Coercive Settlements

The public record in *State of Washington v. Landmark Technology A, LLC* illustrates transaction-cost targeting. Washington alleged that Landmark sent at least 1,892 demand letters to at least 1,176 companies in 48 states over an 18-month period, generally demanding a $65,000 license. Second Amended Complaint ¶¶ 1.1–1.6, *State of Washington v. Landmark Technology A, LLC*, No. 2:21-cv-00728-RSM (W.D. Wash. Jan. 14, 2025), ECF No. 126. The complaint alleged that targets were selected to be large enough to pay but insufficiently resourced to mount a sophisticated patent defense, while companies considered too litigious or likely to receive indemnification from a large platform provider were avoided. *Id.* ¶¶ 1.1–1.6, 4.1–4.7.

The supporting exhibits include internal communications stating that it would be "irresponsible" not to settle a challenge for a few thousand dollars when the business expected to make $1 million; that the model required three licenses per month at a $40,000 settlement rate to net approximately $936,000 annually; and that targets familiar with patent litigation were evaluated based on the anticipated level of resistance. *See Landmark* Exhibits 181-1, 181-2, 181-3, 181-4, and 181-5. Those materials are a documented example of an assertion model—not as evidence about Collision, but as an illustration of how litigation costs and asymmetric ability to

defend can generate nuisance-value settlements even *before* the additional leverage created by a potential injunction is considered.

Small companies are particularly exposed because they often lack a large defensive portfolio, in-house patent counsel, the resources for expert-intensive litigation, and the capital to redesign after launch. A short interruption in sales that a global company could absorb may be devastating for a startup. An equitable rule that increases exclusion threats therefore does not uniformly favor small inventors; it can instead transfer leverage away from small firms that make and sell products.

### C. Empirical Evidence Does Not Establish That *eBay* Has Broadly Harmed Venture-Backed Startups

An empirical study of eBay's effect on venture-backed startups found that *eBay* "had a modest and mixed effect on startup performance, not the broadly negative effect predicted by critics of the decision."[10] The study found "no evidence that startups in affected technology areas were more or less likely than startups in other fields to fail, to raise an additional round of VC investment after *eBay*, or to conduct a down round."[11]

The study further found that "the association between patenting and startup performance may not be driven by the potential enforceability of these patents, but rather may reflect instead alternative sources of patent value recognized in the

---

[10] HELMERS & LOVE, *supra* note 3, at 1.
[11] *Id.* at 5.

literature, especially their value as signals to potential investors and lenders."[12] These findings do not support the government's concern that limits on injunction availability have broadly undermined innovation incentives for startups and small businesses. *See* Statement of Interest at 2–5. Patents matter[13] to startups, but the available evidence does not establish that the threat of market exclusion is the reason patents provide that value.

## VI. STANDARDS ILLUSTRATE THE PUBLIC-INTEREST RISKS OF DISPROPORTIONATE INJUNCTION LEVERAGE

Although the dispute does not involve a standard-essential patent (SEP) subject to a voluntary FRAND licensing commitment,[14] the standards context provides a visible example of a broader economic mechanism relevant here: after a product developer becomes locked into a chosen technology, exclusionary relief can confer leverage attributable to switching costs and downstream investments rather than to the patented invention.

### A. Standardization Can Create Technological and Commercial Lock-In, Giving SEP Owners Additional Leverage

Industry-developed technical standards allow manufacturers and developers

[12] *Id.* at 41.
[13] HELMERS & LOVE, *supra* note 3, at 40–42.
[14] The asserted patent here should not be characterized as standard-essential absent record support establishing both essentiality and an applicable licensing commitment.

to produce interoperable products by defining common protocols and specifications. Interoperability standards such as 5G, Wi-Fi, and Bluetooth are ubiquitous. Small businesses can incorporate standardized features in their products by purchasing off-the-shelf modules without designing these components themselves or developing internal expertise in the underlying technologies.

Once a company develops and begins to sell a product with a standardized feature, abandoning the standard typically becomes costly, especially when the standard[15] has been widely adopted by an industry, leaving no alternative solutions, as often occurs with communications standards such as cellular and Wi-Fi.[16]

This phenomenon, known as lock-in, can make companies that market standard-compliant products susceptible to SEP hold-up because the implementer must choose between accepting the demanded terms and disrupting a product already designed around the standard. Hold-up occurs when SEP owners use the threat of injunctive or exclusionary relief against locked-in manufacturers to extract unreasonable and excessive royalties.

Competition authorities have recognized that "threatening, pursuing, or enforcing injunctions against a good faith potential licensee [of an SEP] may significantly impede effective competition by, for example, forcing the potential licensee into

---

[15] Thomas F. Cotter, Erik Hovenkamp & Norman Siebrasse, *Demystifying Patent Holdup*, 76 WASH. & LEE L. REV. 1501, 1527–29 (2019).
[16] *Id.*

agreeing to potentially onerous licensing terms [which may include higher royalties] which it would otherwise not have agreed to."[17] In 2013, the Department of Justice and the PTO similarly explained that an exclusion order sought on an SEP could allow the patent holder to pressure an implementer into accepting more onerous terms than the FRAND commitment would support.[18]

The empirical record supports this concern. After Huawei obtained an injunction in Germany banning the sale of AVM's Wi-Fi routers and requiring their recall, the parties settled within months, and a study estimated that the injunction's annual cost to AVM would have been nearly 20 times what AVM paid to license Huawei's portfolio.[19] The same study estimated that a year-long German injunction would have cost Ford more than 20 times the annual royalties IP Bridge offered,[20] including roughly €6.6 billion in lost German revenue and up to €1.1 billion in supply-chain disruption,[21] and Ford accepted the requested terms rather than

---

[17] Case COMP/M.6381 – Google/Motorola Mobility, Commission Decision at ¶ 107 (Feb. 13, 2012).
[18] U.S. Dep't of Just. & U.S. Pat. & Trademark Off., *Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments* 6–7 (Jan. 8, 2013) (withdrawn Dec. 19, 2019). The economic point it made does not depend on any particular policy statement.
[19] *See* John Hayes & Assaf Zimring, *Injunctions in Litigation Involving SEPs*, 6/2024 GRUR PATENT 240, 243–44.
[20] *Id.* at 243–44.
[21] Hendrik Fügemann et al., *Economic Impact Assessment of Automatic Injunctions, Microeconomic Study 1: Economic Impact of an Injunction on a Company's Financial Position* 2–3, COPENHAGEN ECON. (Dec. 17, 2024).

continue contesting them.[22] A finding of infringement on a single German patent could thus compel a worldwide portfolio license without a meaningful opportunity to test the validity, essentiality, or value of the remaining patents.[23]

In *Motorola v. Microsoft*, the global royalty Motorola sought under the threat of a German injunction was more than 300 times the FRAND rate a U.S. court later set.[24] Because many SEP licenses are global, an injunction threat in one jurisdiction can distort licensing terms across multiple markets. These examples illustrate why a negotiated payment made under an exclusion threat cannot automatically be treated as an accurate measure of patent value.

### B. Small Implementers Are Already Poorly Positioned to Evaluate and Contest Licensing Demands

SEP licensing is fraught with power imbalances. SEP holders often demand royalties based on a multicomponent device's selling price even when the patented technology reads only on a single chip or module, producing demands far above judicially determined FRAND rates.

Small implementers may lack the resources to identify the patents their components practice; evaluate validity or essentiality; determine whether a proposed rate is reasonable; hire technical and economic experts; litigate or arbitrate a licensing

[22] *Id.*
[23] *Id.*
[24] *Hayes & Zimring, supra note 19, at 241–42.*

dispute; or absorb lengthy product-launch delays. An assessment found that thirty-eight percent of SEP implementers—disproportionately small and medium-sized enterprises—reported that licensing costs were so high they could force them "out of business/change business."[25] As one startup founder explained: "There is no way for us to fight it, we are too small to take on a large organization."[26]

Small businesses that accede to licensing demands rather than negotiate or litigate often pay significantly more per unit than large licensees with the resources and expertise to engage. In a recent UK case, the court observed that the only companies that paid the licensor's much higher published "program rate" were "the smallest and least sophisticated licensees."[27] Another UK judge commented that "no implementer could stay in business paying [the licensor's] rates."[28] A negotiated rate may therefore reflect disparities in resources and resistance capacity rather than the value of the patented technology.

### C. Injunction Risk Can Discourage Standards Adoption and Market Participation

The risk of injunction-driven SEP hold-up can discourage adoption of

---

[25] *See* EUR. COMM'N, COMMISSION STAFF WORKING DOCUMENT: IMPACT ASSESSMENT REPORT at 15 (Apr. 27, 2023).
[26] Joachim Henkel, *Licensing Standard-Essential Patents in the IoT*, 51 RES. POL'Y 1, 7 (2022).
[27] *InterDigital Tech. Corp. v. Lenovo Group Ltd.* [2023] EWHC 539 (Pat) ¶ 516 (Mar. 16, 2023), rev'd in part on other grounds, [2024] EWCA Civ 743.
[28] *Optis Cellular Tech. LLC v. Apple Inc.* ¶ 467(iv) [2023] EWHC 1095 (Ch) (May 10, 2023), rev'd in part on other grounds, [2025] EWCA Civ 552.

standardized technology, delay launches, and divert research funds to legal and licensing expenses, resulting in fewer connected products, less downstream innovation, higher prices, and reduced choice. Those consequences belong in the equitable analysis because they bear on both the balance of hardships and the public interest.

The standards context therefore does not ask this Court to decide whether the asserted patent is standard-essential or whether Collision made a FRAND commitment. It illustrates why eBay requires a case-specific assessment of what an injunction would protect and what leverage it would create. When exclusion threatens an entire product incorporating many technological inputs, courts must distinguish the value of the patented contribution from the costs imposed by switching, redesign, and market disruption.

## CONCLUSION

The Court should affirm the denial of Collision's requested injunction. The district court correctly rejected arguments that continuing infringement, historical equity practice, or the general public interest in patent enforcement effectively compels an injunction. But its acceptance of the government's analysis under factors one and two should not become a roadmap for converting ordinary licensing injuries into irreparable harm.

Collision's historical loss of a design-win opportunity may support monetary

relief for a past commercial injury, but it does not identify a present competitive position that an injunction would restore, particularly now that Collision has left the market. The record also does not establish that Samsung's infringement caused Collision to lose the asserted design win or exit the market. Nor does the ordinary difficulty of patent valuation demonstrate that an ongoing royalty is inadequate—particularly where Collision's business model, negotiations, damages case, and requested alternative relief all contemplate monetary compensation for use of its technology.

For small businesses, greater injunction availability does not operate solely to protect their patents. It also magnifies the risks they face as product developers, standards implementers, suppliers, customers, and patent-litigation defendants. The available empirical evidence does not show that *eBay* broadly harmed startup performance, and documented assertion practices show how litigation asymmetries can redirect scarce resources from innovation toward defense and coercive settlement. The standards context further demonstrates how exclusionary leverage can capture value attributable to technological lock-in, complementary innovations, and downstream investment rather than to the patented invention.

The Court should therefore affirm the judgment while clarifying that (1) a historical commercial loss must be connected to a prospective, causally related injury that an injunction can redress; (2) valuation and damages-calculation difficulties do

not themselves establish irreparable harm or inadequate legal remedies; and (3) bargaining leverage attributable to exclusion distorts patent value.

Respectfully submitted,

Dated: September 21, 2026

/s/ Brian Scarpelli
BRIAN SCARPELLI
ASSOCIATION FOR COMPETITIVE TECHNOLOGY
1401 K Street, NW
Suite 501
Washington, DC 20005
(517) 507-1446
bscarpelli@actonline.org

*Counsel for* Amici *Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel for amici curiae certifies that this brief:

(1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Federal Circuit Rule 29(b) because it contains 6,983 words, including footnotes and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b); and

(2) complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because this document has been prepared using Microsoft Office Word and is set in the Times New Roman font in a size equivalent to 14 points or larger.

Dated: September 21, 2026

/s/ Brian Scarpelli
Brian Scarpelli
*Counsel for* Amici *Curiae*